UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>ABCELLERA BIOLOGICS INC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BRUKER CELLULAR ANALYSIS, INC.,<br><br>Defendant.</td><td>Case No. 20-cv-08624-JST<br><br>**CLAIM CONSTRUCTION ORDER**</td></tr>
</table>

The parties propose competing constructions of ten terms from seven asserted patents in two families. The Court will construe the terms as follows.

## I.     BACKGROUND

The procedural history of this case is summarized in greater detail in the Court's prior orders. *See* ECF No. 191, 252. Plaintiff AbCellera Biologics, Inc. ("AbCellera") is a biotechnology company that discovers antibodies for the prevention and treatment of disease. ECF No. 254 ¶ 18. Together with Plaintiff The University of British Columbia ("UBC"), AbCellera patented the use of microfluidic devices for high-throughput single-cell secretion assays that can be applied to antibody discovery and cell clone selection. *Id*. ¶ 19. The present case is a consolidated action incorporating three patent infringement cases brought by Plaintiffs in the United States District Court for the District of Delaware in the summer of 2020, which were transferred to this District and consolidated into the instant action. *See* ECF Nos. 26, 70.

Plaintiffs assert a total of seven patents in this case, falling in two families: United States Patent No. 10,087,408 (the "'408 patent") and United States Patent Nos. 10,421,936 (the "'936 patent") and 10,738,270 (the "'270 patent"), which claim priority to the '408 patent (collectively, the "'408 patent family"); and United States Patent No. 10,775,376 (the "'376 patent"), and

United States Patent Nos. 10,697,962 (the "'962 patent"), 10,775,377 (the "'377 patent"), and

10,775,378 (the "'378 Patent") which claim priority to the '376 patent (collectively, the '962

patent family").[1]   The patents of the '408 patent family are directed to methods of culturing cells,

and the patents of the '962 patent family are directed to methods of assaying cellular binding

interactions.  *See* ECF No. 254 ¶¶ 20–35.  The parties dispute the construction of ten terms in

asserted patents: five terms from each patent family.

## II.      JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III.     LEGAL STANDARD

Claim construction is a question of law to be determined by the court. *Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370

(1996).  The "correct construction" is one that "stays true to the claim language and most naturally

aligns with the patent's description of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316

(Fed. Cir. 2005) (en banc) (*quoting Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243,

1250 (Fed. Cir. 1998)).  "The purpose of claim construction is to determine the meaning and scope

of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,

521 F.3d 1351, 1360 (Fed. Cir. 2008) (quotation omitted).  Accordingly, "[w]hen the parties

present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve

it." *Id.* at 1362; *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319

(Fed. Cir. 2016) (finding legal error in trial court's decision not to construe terms despite

fundamental dispute between parties).

It is "a basic principle of claim construction . . . that 'the words of a claim are generally

given their ordinary and customary meaning.'" *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753

F.3d 1291, 1299 (Fed. Cir. 2014) (quoting *Philips*, 415 F.3d at 1312).  Because the claims "do not

stand alone," they "must be read in view of the specification, of which they are a part." *Philips*,

415 F.3d at 1315 (internal quotation omitted).  Thus, the ordinary and customary meaning of a

---

[1] The Court refers to this family as the '962 patent family to be consistent with the parties'
briefing.  *See* ECF No. 267 at 13 n.1.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

claim term is "not the meaning of the term in the abstract," but rather "its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321; *see also Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1042 (Fed. Cir. 2019) ("Claim construction seeks to ascribe to claim terms the meaning a person of ordinary skill in the art at the time of invention would have given them."); *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016) ("Claim construction requires a determination as to how a person of ordinary skill in the art would understand a claim term in the context of the entire patent, including the specification." (internal quotation omitted)). The specification "is always highly relevant to the claim construction analysis" and is usually "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation omitted). In particular, the specification "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess" or "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* at 1316.

In addition to consulting the specification, "the court should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. However, "because the prosecution history represents an ongoing negotiation between the [Patent and Trademark Office] and the applicant, rather than the final product," that history "often lacks the clarity of the specification" and therefore "is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

Finally, courts may consider extrinsic evidence, such as "dictionaries, and especially technical dictionaries, [which] can assist the court in determining the meaning of particular terminology to those of skill in the art" because they "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. However, such evidence is generally of less significance than the intrinsic record[.]" *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019). Courts may also consider treatises and expert and inventor testimony, but they "should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history." *Id.* at 1317-18 (quoting *Key Pharms. v. Hercon Lab'ys Corp.*, 161 F.3d 709, 716 (1998)).

## IV.    DISCUSSION

### A.    "chamber" ('408, '936, and '270 Patents)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Adopted Construction |
|---|---|---|
| "an enclosed space within a microfluidic device" | "an enclosed space within a microfluidic device in which one or more cells may be isolated from a larger population of cells as the cells are flowed through the device. Each chamber will have at least one inlet for permitting fluid, including fluid containing cells, to enter the chamber, and at least one outlet to permit fluid to exit the chamber. Each chamber will further have at least one cell retaining position which may comprise at least one cell retainer." | "an enclosed space within a microfluidic device, having at least one inlet for permitting fluid to enter the chamber, at least one outlet to permit fluid to exit the chamber, and at least one cell retaining position." |

Here, Defendant argues that the patentee of the '408 patent family acted as its own lexicographer by specifically defining the term "chamber" in the definitions section of the specification.  That definition reads:

> A "chamber" or "cell capture chamber," as used herein, refers to an enclosed space within a microfluidic device in which one or more cells may be isolated from a larger population of cells as the cells are flowed through the device.  Each chamber will have at least one inlet for permitting fluid, including fluid containing cells, to enter the chamber, and at least one outlet to permit fluid to exit the chamber.  Persons skilled in the art will understand that an inlet or an outlet can vary considerably in terms of structure and dimension, and may be reversibly switched between an open position, to permit fluid to flow into or out of the chamber, and a closed position to seal the chamber and thereby isolate and retain its contents, whereby the aperture may also be intermediate between the open and closed positions to allow some fluid flow.  Each chamber will further have at least one cell retaining position which may comprise at least one cell retainer.

'408 patent at 9:11–27.  Plaintiffs agree that the specification sets forth an express lexicographical definition of "chamber," but argue that definition should be limited to the first clause of the

4

1    paragraph— "an enclosed space within a microfluidic device."

2         A patentee seeking to act as its own lexicographer "must clearly express that intent in the

3    written description" with "sufficient clarity to put one reasonably skilled in the art on notice that

4    the inventor intended to redefine the claim term." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395

5    F.3d 1364, 1370 (Fed. Cir. 2005). Where a patentee has done so, the "definition of a claim term in

6    the specification will prevail over a term's ordinary meaning[.]" *3M Innovative Properties Co. v.*

7    *Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003); *see also Jack Guttman, Inc. v.*

8    *Kopykake Enterprises, Inc.,* 302 F.3d 1352, 1360–61 (Fed. Cir. 2002) ("Where, as here, the

9    patentee has clearly defined a claim term, that definition usually is dispositive; it is the single best

10   guide to the meaning of a disputed term."). Here, the '408 patent family's specification contains

11   an express "definitions" section that includes the term "chamber," clearly placing a POSITA on

12   notice that the patentee intended to put forth a "special definition . . . that differs from the meaning

13   it would otherwise possess." *Phillips*, 415 F.3d at 1315. In fact, that much is undisputed; the

14   parties dispute only the extent to which the Court should incorporate that paragraph in its

15   construction.

16        Plaintiffs object to Defendant's construction for two reasons. First, Plaintiffs argue that

17   Defendant's construction improperly introduces optional language by including the phrases "in

18   which one or more cells may be isolated from a larger population of cells as the cells are flowed

19   through the device[]" and "[e]ach chamber will further have at least one cell retaining position

20   which may comprise at least one cell retainer." *See* ECF No. 267 at 22. The Court agrees. The

21   "use of the word 'may' in the definition strongly implies" that such features are not necessarily

22   required. *Game & Tech. Co. v. Wargaming Grp. Ltd.,* 942 F.3d 1343, 1351 (Fed. Cir. 2019).

23   Courts have excised such optional or exemplary phrases from lexicographical definitions. *See*

24   *Martek Biosciences Corp. v. Nutrinova, Inc.,* 579 F.3d 1363, 1380–81 (Fed. Cir. 2009) (construing

25   the term "animal" consistent with only the first sentence of lexicographical definition, and

26   excluding subsequent sentences describing "[p]referred animals" and "[m]ore preferred animals");

27   *Bioverativ Inc. v. CSL Behring LLC*, No. 1:17-CV-00914-RGA, 2019 WL 1276030, at *8 (D. Del.

28   Mar. 20, 2019) (excluding from the lexicographical definition sentences in the specification

United States District Court
Northern District of California

1    beginning with "preferred routes" and "additional routes" on the grounds that these phrase

2    rendered those sentences "clearly exemplary, rather than definitional, and not lexicography.").

3            Defendant cites to only one[2] case in which a court included such optional language in its

4    construction, *Shire Dev. LLC v. Teva Pharms. USA, Inc.*, No. 1:17-cv-001696-RGA, 2019 WL

5    969638, at *9 (D. Del. Feb. 28, 2019).  There, the court construed the term "pulsed release" (in the

6    context of drug dosages) consistent with the patent's lexicographical definition, as:

7                   a drug is delivered in one or more doses that fluctuate between a
                    maximum and minimum dose over a period of time. This can be
8                   represented by a dose release profile having one or more distinct
                    peaks or valleys. However, two or more pulsed releases may produce
9                   an overlapping, overall, or composite release profile that appears or
                    effectively is constant. When two or more pulsed releases occur, there
10                  may or may not be a period of no release between pulses. Typically,
                    pulsed release results in release of essentially all of a drug within
11                  about 60 minutes or less

12   *Shire*, 2019 WL 969638, at * 10.  The *Shire* court included within the construction optional

13   language of what a "pulsed release" "can be," "may or may not be," or "typically is" because

14   "dictionaries regularly define terms by referencing key parameters . . . [like] what it is, what it

15   may be, or by what it typically is." *Id.*  The *Shire* court further concluded that excluding such

16   language would "not capture the Patentee's lexicographical definition of 'pulsed release'" because

17   such language was "important definitional information[.]" *Id.*

18           This Court finds the *Shire* court's reasoning inapplicable here.  In that case, the optional

19   language included in the court's construction described situations in which "two or more pulsed

20   releases may produce an overlapping, overall, or composite release profile that appears or

21   effectively is constant." *Id.*  Such information was "important definitional information" because it

22

23   _____

24   [2] Defendant also relies upon *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132,
     1136–38 (Fed. Cir. 2007), which construed the term "controlled amount" of a protic material in a
25   particular reaction to include "e.g., up to about 4% $H_2O$ based on the volume of the reaction
     mixture when aniline is utilized solvent."  However, the court there also relied upon an express
26   lexicographical statement that "[w]hen aniline is utilized as a solvent with the same base [TMAH],
     the upper limit is 4% $H_2O$ based on the volume of the reaction mixture[,]" and found that
27   therefore, in such situations, "the express definition is neither ambiguous nor incomplete—the
     'controlled amount' is 'up to about 4% $H_2O$ based on the volume of the reaction mixture.'" *Id.* at
28   1138.  In light of this reasoning, the Court does not read *Sinorgchem's* construction as including
     optional language in a lexicographical definition.

United States District Court
Northern District of California

1    described how an apparently constant release of a drug could still fall within the lexicographical

2    definition of a "pulsed release."  Here, the language that Defendant seeks to include, that the

3    microfluidic device containing the "chamber" is one "in which one or more cells may be isolated

4    from a larger population of cells as the cells are flowed through the device" or that the "at least

5    one cell retaining position . . . may comprise at least one cell retainer," is not key to understanding

6    the patentee's lexicographical definition of chamber.  Thus, there is no need to include it.

7         Second, Plaintiffs also argue that Defendant "improperly attempts to read into the

8    construction of 'chamber' other claim terms ('inlet'; 'outlet'; 'retaining position') . . . that are

9    recited elsewhere in the claims [and] two of which ('inlet' and 'outlet') are disputed claim

10   terms . . . ."  ECF No. 267 at 22.  Here, the Court is not persuaded that this is improper, as these

11   terms are incorporated into the lexicographical definition of the specification; the patentee

12   expressly stated that each "chamber," as used in the specification, "*will have* at least one inlet . . .

13   at least one outlet . . . [and] at least one cell retaining position . . . ."  '408 patent at 9:11–27

14   (emphasis added).  The specification's use of the phrase "[e]ach chamber will have" is an "explicit

15   characterization of all of the ['chambers'] in the invention."  *X One, Inc. v. Uber Techs., Inc.*, No.

16   16-CV-06050-LHK, 2017 WL 3581184, at *14 (N.D. Cal. Aug. 18, 2017).  A POSITA, reading

17   the specification, would understand that these are mandatory features of the "chamber" and should

18   therefore be included in the construction.

19        Plaintiffs' cited authorities on this point are all inapposite because none of them involved a

20   claim term being lexicographically defined by the patentee using references to other claim terms.

21   *See Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1348 (Fed. Cir. 2007); *Aevoe Corp. v. AE*

22   *Tech Co.*, No. 2:12-CV-00053-GMN, 2013 WL 2095949, at *6 (D. Nev. May 14, 2013); *STV Asia*

23   *Ltd. v. PRN Corp.*, No. 06-CV-1664 JCS, 2007 WL 521236, at *6 (N.D. Cal. Feb. 15, 2007).

24   Those cases declined to construe terms in ways that referenced other disputed terms, because such

25   a construction would either be redundant with, or logically incompatible with, the claim language.

26   Here, however, the patentee chose to define "chamber" in a way that incorporates other claim

27   terms such as "inlet" and "outlet," and Plaintiffs cite no authority suggesting that the Court may

28   override the patentee's clearly expressed lexicographical intent.  Nor does the Court see any

United States District Court
Northern District of California

reason why the "language of the claims does not reasonably or logically permit" Defendant's construction. *Z4 Techs*, 507 F.3d at 1348.  While the '936 and '270 patents do not recite an "outlet" in the claim language, that alone does not render the inclusion of an "outlet" in the construction of a "chamber" logically impermissible.

Accordingly, the Court adopts the following construction: "an enclosed space within a microfluidic device, having at least one inlet for permitting fluid to enter the chamber, at least one outlet to permit fluid to exit the chamber, and at least one cell retaining position."

**B.    "inlet" ('408, '936, and '270 Patents)**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Adopted Construction |
|---|---|---|
| Plain and ordinary meaning, no construction necessary | "An aperture that permits fluid to enter a chamber. An inlet of a chamber cannot simultaneously be an outlet of the same chamber." | "An aperture that permits fluid to enter a chamber. An inlet of a chamber cannot simultaneously be an outlet of the same chamber." |

The parties' dispute as to this claim term (and the related term "outlet") centers around whether, in the context of the '408 patent family, an "inlet" of the chamber can simultaneously be the "outlet" of that same chamber.  Because this question is a fundamental dispute as to the scope of the claim term, the Court is legally obligated to resolve the question at claim construction, and cannot leave it for the jury to decide at trial.  *See Eon*, 815 F.3d at 1319.  Thus, as an initial matter, the Court must reject Plaintiffs' proposal that no construction is necessary for this term.

As to the central issue, Defendant urges that the Court incorporate in the construction a negative limitation that "[a]n inlet of a chamber cannot simultaneously be an outlet of the same chamber."  ECF No. 267 at 31–32.  Defendant presents three arguments for this construction, all from the intrinsic record.  First, Defendant argues that the express definition of the term "chamber" in the specification requires each chamber to have a separate "inlet" for fluid to enter the chamber, and "outlet" for fluid to exit the chamber, such that fluid is able to flow *through* the chamber.  *See id.* at 31.  Second, Defendant argues that the specification's description of the locations of the "inlet" and "outlet" as being located "downstream" or "upstream" in reference to that fluid flow further supports the contention that they must be separate.  *See id.* at 32.  Third,

1    Defendant argues that the specification defines the term "first region" as "a region of the chamber

2    that is interposed between the inlet and outlet positions," such that necessary features of the

3    chamber such as its "aspect ratio," defined in reference to this "first region," require there be

4    distance between the inlet and outlet.  *Id.* at 32–33.

5           The Court agrees with Defendant's proposed construction.  Negative limitations "must find

6    support either 'in the words of the claim' or through an 'express disclaimer or independent

7    lexicography in the written description that would justify adding that negative limitation.'"

8    *Ethicon, LLC v. Intuitive Surgical, Inc.*, 847 Fed. App'x 901, 907 (Fed. Cir. 2021) (quoting

9    *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003)).  Here, that support is

10   strongest in the specification's definition of "first region" as the region of the chamber "interposed

11   between the inlet and outlet positions," a definition that would make no sense unless each chamber

12   must have a separate "inlet" and "outlet."  '408 patent at 10:11–13.  That definition is further

13   incorporated into the specification's definition of "aspect ratio," *see id.* at 12:14–17, and described

14   extensively throughout the specification.  *See id.* at 2:67–3:2; 4:13–43.  And this support is not just

15   in the written description, but also the "words of the claim"—specifically, claim 12 of the '408

16   patent, which recites "[t]he method of claim 1, wherein . . . x is the length of the shortest distance

17   *between the inlet and the outlet* and y is the length of the shortest distance between the retaining

18   position and a region of the chamber that is interposed directly *between the inlet and outlet*

19   *positions.*"  *Id.* cl. 12 (emphasis added).   Similarly, the specification's definition of "upstream"

20   and "downstream" in reference to the "inlet" and "outlet" would not make logical sense if the

21   "inlet" and "outlet" could be the same aperture.  *See id.* at 9:28–32.  This is not a case where a

22   party seeks to import a negative limitation because of the lack of a particular embodiment in the

23   specification, as in *Ethicon*, but rather a case where the negative limitation is a logical requirement

24   to the lexicographical definition of certain terms and claim language.  *Cf. Ethicon*, 847 Fed. App'x

25   at 907 (rejecting attempt to import negative limitation because embodiments depicted in

26   specification were consistent with negative limitation); *Lyft, Inc. v. Quartz Auto Techs. LLC*, No.

27   21-cv-01871-JST, 2022 WL 19975246, at *6 (N.D. Cal. Nov. 3, 2022) ("[T]he Court will not read

28   a negative limitation into the claims *based on the lack of a particular embodiment*." (emphasis

United States District Court<br>Northern District of California

1    added)).  A POSITA, reviewing the '408 patent family's specification, would understand that the

2    "inlet" and "outlet" must be separate, such that a first region may be defined in terms of the

3    distance between the two.

4    Plaintiffs' counterarguments are unconvincing.  First, Plaintiffs argue that the specification

5    and claims state that an "inlet" can also be an "outlet," and vice versa.  *See, e.g.*, '408 patent cls.

6    32, 33.  But such language refers to the disclosure that the flow of the chamber may be reversed,

7    such that the "inlet" of the chamber becomes the "outlet" and vice versa.  *See id.* at 9:32–34.  In

8    such a case however, the "inlet" and "outlet" are still not simultaneously the same aperture or

9    opening, which is consistent with the specification's reference to the "first region" interposed

10   between these two locations.  In other words, the reversible flow described in the patent does not

11   change the requirement that each chamber have *both* an "inlet" and "outlet" that are separate

12   apertures.

13   Plaintiffs also argue that "a POSITA . . . would understand that an aperture could indeed

14   serve as both an inlet and an outlet . . . . [because] the '962 patent family specification explicitly

15   states that a 'single aperture could function as *both* an inlet and an outlet' and that 'an aperture

16   may serve as *both* an inlet and an outlet.'" ECF No. 267 at 38 (emphasis in original).  This

17   argument, relying upon an express statement in the specification of a related but different family

18   of patents, ultimately only serves to underscore that a POSITA, having reviewed the intrinsic

19   record of the '408 patent family and the '962 patent family, would understand that the patentee, *in

20   the context of the '408 patent family*, intended for the "inlet" and "outlet" to refer to separate

21   apertures.  The patentee clearly understood and intended to convey that, in the '962 patent family,

22   a single aperture could function and serve as both "inlet" and "outlet."  It is telling that no similar

23   statement exists in the specification of the '408 patent family, which as Plaintiffs point out,

24   "shares overlapping inventors, common subject matter, the same assignee" and was filed within

25   days as the provisional of the '962 patent family.  *Id.*

26   For the foregoing reasons, the Court adopts the following construction:  "An aperture that

27   permits fluid to enter a chamber. An inlet of a chamber cannot simultaneously be an outlet of the

28   same chamber."

10

C.      "outlet" ('408 Patent)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Adopted Construction |
|---|---|---|
| Plain and ordinary meaning, no construction necessary | "An aperture that permits fluid to exit a chamber. An outlet of a chamber cannot simultaneously be an inlet of the same chamber." | "An aperture that permits fluid to exit a chamber. An outlet of a chamber cannot simultaneously be an inlet of the same chamber." |

This dispute is the converse of the prior dispute, and the issue is essentially the same— whether an outlet of a chamber can simultaneously be an inlet of the same chamber.  Accordingly, the Court need not repeat its analysis as to "inlet" here.  For the same reasons set forth above, the Court will adopt Defendant's construction:  "An aperture that permits fluid to exit a chamber. An outlet of a chamber cannot simultaneously be an inlet of the same chamber."

D.      **"wherein individual cells of the population are retained in unique microfluidic chambers . . . , and the cells are transported via the introduction port and flow channel into the unique microfluidic chambers" ('936 Patent)**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Adopted Construction |
|---|---|---|
| This phrase is not a claim term and is not appropriate for construction. This is an attempt to circumvent the N.D. Cal. Patent Local Rules and the 10-claim term limit agreed upon by the parties. The Court should not construe this phrase.<br><br>To the extent that the Court construes this phrase, it should be given the plain and ordinary meaning of its component terms. | "wherein individual cells of the population are loaded stochastically into unique microfluidic chambers via the introduction port and flow channel, such that a subset of the unique microfluidic chambers in the microfluidic device retain an individual cell" | Plain and ordinary meaning, no construction necessary |

Defendant argues that this claim term should be construed narrowly to require stochastic[3] loading of cells into the microfluidic chamber.  *See* ECF No. 267 at 44–47.  The Court agrees with Plaintiffs that this is not really a dispute over the appropriate meaning of a claim term, but rather

---

[3] In the context of the asserted patents, "stochastic" means "having a random probability distribution or pattern that may be analyzed statistically but may not be predicted precisely."  *See* ECF No. 267 at 46 n.4.

United States District Court
Northern District of California

an attempt by Defendant to rewrite a claim limitation wholesale.  Defendant's argument is essentially one of enablement and/or written description: in its own words, the "crux of this claim construction dispute" is "how can a population of cells be introduced *en masse* through a singular introduction port, transported via the flow channels (that connect the chambers) into the chambers through their inlets, and yet end up with *single* cells retained each in its own chamber?"  *Id.* at 45 (emphasis in original).  Defendant argues that the '936 patent discloses and enables only one solution—stochastic loading—and that therefore, the claim limitation should be construed as limited to that solution.  *See id.* at 46–47.

These concerns do not justify Defendant's proposed construction.  First, "[e]nablement concerns do not justify departing from the plain and ordinary meaning of [a claim term]" and "[w]here the meaning of a claim term is clear, as it is here, [the court should] not rewrite the claim to preserve its validity."  *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014).  Defendant does not argue that the plain and ordinary meaning of the claim language is unclear, only that the language encompasses embodiments that lack adequate written description and/or enablement.  That is an insufficient basis to depart from the plain language of the claim. *See also Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) ("It is improper for a court to add extraneous limitations to a claim . . . wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.").  The *Hill-Rom* court also cautioned courts "not to allow claim construction to morph into a mini-trial on validity," which is precisely what Defendant's construction asks the Court to do: determine what is adequately described and enabled by the '936 patent's specification, and then narrow the claim accordingly. The Court will not do so.

Defendant's construction also excludes certain embodiments, as the specification discloses both stochastic and deterministic loading—as Defendant acknowledges.  *See* ECF No. 267 at 51 (acknowledging disclosure in specification that valve structures could be designed to deterministically place cells in chambers).  Instead, Defendant argues that the specification's disclosure is "a wish or hope for a device with this capability, not a demonstration that the inventors were in possession of such a device."  *Id.*  But a patentee need only enable one mode of

1   making and using the full invention, and enablement does not "require the inventor to foresee

2   every means of implementing an invention at pains of losing his patent franchise." *Invitrogen*

3   *Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1071 (Fed. Cir. 2005); *see also Edwards*

4   *Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1309 (Fed. Cir. 2012).  Whether the patentee

5   was actually "in possession of" a deterministic loading embodiment therefore does not bear on

6   whether the claim language should be construed to exclude such an embodiment.

7          The cases cited by Defendant are also inapplicable.  In *In re Abbott Diabetes Care Inc.*

8   *("Abbott"),* 696 F.3d 1142, 1148 (Fed. Cir. 2012) and *Groove Digital, Inc. v. United Bank,* 825

9   Fed. App'x 852, 856 (Fed. Cir. 2020), the issue was whether a patentee's repeated, consistent, and

10  exclusive use of a claim term in a certain way effectively amounted to a lexicographical

11  redefinition of the term by implication.  In *Abbott*, the term in question was "electrochemical

12  sensor," which the court construed as excluding sensors with external cables or wires because the

13  patents at issue "repeatedly, consistently, and exclusively depict[ed] an electrochemical sensor

14  without external cables or wires while simultaneously disparaging sensors with external cables or

15  wires."  696 F.3d at 1150.  Similarly, in *Groove Digital*, the court construed the term "applet" to

16  require geotargeting, because "in every pertinent embodiment disclosed in the specification,

17  applets are served based on geotargeted specifications."  825 Fed. App'x at 857.  Here, Defendant

18  points to no claim term that is used in such a repeated and consistent manner; the proposed term

19  for construction is an entire claim limitation, and it is simply implausible that the patentee

20  intended to redefine the entire limitation "by implication" in this specification.  Rather,

21  Defendant's proposed construction "plainly seeks to confine the claims to those embodiments

22  disclosed in the specification, and asks the Court to commit the "'cardinal sin' of claim

23  construction by importing limitations from the written description into the claims." *Largan*

24  *Precision Co. v. Motorola Mobility LLC*, No. 21-cv-09138-JSW, 2024 WL 2060864, at *6 (N.D.

25  Cal. May 7, 2024) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir.

26  2002)).

27

28

United States District Court
Northern District of California

Accordingly, the Court agrees with Plaintiffs that this term needs no construction.[4]

**E.   "cell trap" ('936 Patent)**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Adopted Construction |
|---|---|---|
| Not governed by 35 U.S.C. § 112(6)<br><br>"a means for receiving and retaining cells at a predetermined location over time."<br><br>To the extent that the Court determines that the term "cell trap" is governed by 35 U.S.C. § 112(6), Plaintiffs identify the following structure(s), act(s), or material(s) corresponding to that term's function:<br><br>'936 patent, Abstract; FIGS. 3, 4, 4:62-5:3; 5:7-11; 6:59-7:8; 13:67-14:15; 14:48-15:57; 29:58-63; 34:15-35:22; 35:53-36:26; 45:51-56. | Governed by 35 U.S.C. § 112(6)<br><br>"a means for receiving and retaining cells at a predetermined location over time."<br><br>'936 patent at 14:48-50. Corresponding structure: 14:48-15:44. | Governed by 35 U.S.C. § 112(6)<br><br>"a means for receiving and retaining cells at a predetermined location over time."<br><br>Corresponding structure: 14:48-15:57; 34:15–35:22; 35:53–36:26; FIG. 3; FIG. 4. |

The parties first dispute whether the term "cell trap" is governed by pre-AIA 35 U.S.C. § 112(6).  Under § 112(6), claims may be drafted "as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and [] shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112(6).  Section 112(6) represents "a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed . . . ." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015).  In order to determine whether a claim limitation is subject to § 112(6), courts begin

---

[4] To the extent Defendant argues that the Court is obligated to resolve "a fundamental dispute regarding the scope of a claim term[,]" *O2 Micro*, 521 F.3d at 1362, this order does so by rejecting Defendant's proposal to limit the scope of this claim term.  Defendant presents no other dispute as to the scope of this claim term, and the Court need construe "only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy."  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

1   with the language of the claim.  The Federal Circuit has long recognized that the "use of the word

2   'means' in a claim element creates a rebuttable presumption that § 112, para. 6 applies."

3   *Williamson*, 792 F.3d at 1348 (internal citation omitted).  Conversely, "the failure to use the word

4   'means' also creates a rebuttable presumption—this time that § 112, para. 6 does not apply."  *Id.*

5      Because the claim term at issue does not use the word "means," the Court begins with the

6   rebuttable presumption that § 112(6) does not apply to the term "cell trap."  In order to rebut this

7   presumption, Defendant must show that "the claim term fails to 'recite[] sufficiently definite

8   structure' or else recites 'function without reciting sufficient structure for performing that

9   function.'"  *Id.* (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)) (alterations in

10  original).  In other words, Defendant must "show, by a preponderance of the evidence, that

11  persons of ordinary skill in the art would not have understood the ['cell trap'] limitations to

12  connote structure in light of the claim as a whole."  *Dyfan, LLC v. Target Corp.,* 28 F.4th 1360,

13  1367 (Fed. Cir. 2022).

14     The Court finds that Defendant has met that burden.  The parties do not dispute that the

15  specification expressly defines the term "cell trap" as "generally a means for receiving and

16  retaining cells at a pre-determined location over time."  '936 patent at 14:48–50.  Plaintiffs argue

17  that the term "cell trap" would be understood by a POSITA to connote a sufficiently definite

18  structure, because it does not use the word "means" and is not a "nonce term" such as "element"

19  or "device," *see* ECF No. 267 at 56, but that argument is simply not credible in light of Plaintiffs'

20  own proposed construction, which adopts the patent's express lexicographical definition of "cell

21  trap" as "a means for receiving and retaining cells at a predetermined location over time."  Put

22  differently, the Court struggles to square Plaintiffs' argument that "cell trap," as used and defined

23  in the '936 patent, is not a substitute for the term "means for . . . ," when Plaintiffs' own position

24  is that a POSITA, having read the '936 patent intrinsic record, would understand that a cell trap is

25  a "means for receiving and retaining cells at a pre-determined location over time."  And, while

26  Plaintiffs argue that the specification recites several structures encompassed by the term "cell trap"

27  such as "a mechanical trap, a hydrodynamic trap, [etc.,]" *id.* at 56–57, it is equally telling that

28  Plaintiffs do not narrow their proposed construction to such exemplary structures.  Again,

United States District Court
Northern District of California

15

1    Plaintiffs' argument that a skilled artisan would construe the term so broadly as to encompass any

2    "means for receiving and retaining cells at a pre-determined location over time" essentially

3    concedes that the same artisan would not understand the term to connote a sufficiently definite

4    structure. Accordingly, the Court concludes that the term "cell trap" in the '936 patent is governed

5    by pre-AIA § 112(6), as "a means for receiving and retaining cells at a predetermined location

6    over time."

7         Having found that "cell trap" is subject to § 112(6), the Court must then determine "what

8    structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*,

9    792 F.3d at 1351. "Structure disclosed in the specification qualifies as 'corresponding structure' if

10   the intrinsic evidence clearly links or associates that structure to the function recited in the claim."

11   *Id.* at 1352 (citing *Noah Sys., Inc. v. Intuit, Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012)). The

12   parties agree that 14:48–15:44 of the specification discloses such a corresponding structure, while

13   Plaintiffs argue that additional disclosures can be found in the '936 patent's abstract and at 4:62–

14   5:3; 5:7–11; 6:59–7:8; 13:67–14:15; 15:44–57; 29:58–63; 34:15–35:22; 35:53–36:26; 45:51–56;

15   and FIGS. 3 and 4.

16        The Court first agrees that additional corresponding structure is disclosed in 15:44–57;

17   34:15–35:22; 35:53-36:26; and FIGS. 3 and 4 of the specification. 15:44–57 describes how the

18   "size of the cell trap may be varied according to the size, type, mechanical properties, or number

19   of cells that are desired to be trapped" and that multiple different trap designs may be combined in

20   each chamber. 34:15–35:22 and 35:53-36:26, and FIGS. 3 and 4 describe an embodiment of the

21   claimed invention including a "non-perturbing microfluidic cell capture and retention mechanism

22   that uses gravity to trap cells . . . ." 34:15–17. These passages are thus relevant to the structure of

23   how a cell trap receives or retains cells at a predetermined location. The Court will therefore

24   include these disclosures in the § 112(6) means-plus-function construction of the term "cell trap."

25        However, the Court disagrees that the '936 patent's Abstract or 4:62–53; 5:7–11; 6:59–7:8

26   disclose a corresponding structure for cell trap; these passages describe retaining cells in a

27   microfluidic device generally, or chambers having a "cell retainer," but provide no evidence of a

28   structure of a "cell trap" that is linked to the function of receiving or retaining cells at a

United States District Court
Northern District of California

16

predetermined location. Similarly, 13:67–14:15 merely describes a "cell retaining position" or "cell retainer," which is defined as "a location in the chamber at which a cell is maintained during cell culture and media storage" and 29:58–63 and 45:51–56 merely state that cells may be retained via gravitational forces, but does not describe a structure linked to such a function.  As such, these passages also do not describe a corresponding structure for cell traps.

For the foregoing reasons, the Court adopts the following construction: Governed by 35 U.S.C. § 112(6), "a means for receiving and retaining cells at a predetermined location over time." Corresponding structure: 14:48-15:57; 34:15–35:22; 35:53–36:26; FIG. 3; FIG. 4.

### F.     "chamber" ('962, '933, '376, and '378 Patents)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Adopted Construction |
|---|---|---|
| "an enclosed space within a microfluidic device" | "an enclosed space within a microfluidic device in which a cell may be retained" | "an enclosed space within a microfluidic device" |

The parties' only dispute as to this claim term is whether to include the phrase "in which a cell may be retained"—Defendant argues that the term is part of the specification's lexicographical definition of the term, whereas Plaintiffs argue that the phrase is "optional, redundant, unnecessary, and confusing . . . ."  *See* ECF No. 267 at 59–60.  The relevant lexicographical definition in the specification of a "chamber" is "an enclosed space within a microfluidic device in which a cells [sic] may be retained."  '962 patent at 14:16–18.

This dispute is essentially the same as the first part of the dispute as to the term "chamber" in the '408 patent family.  *See* Section IV(A), *supra*.  For the same reasons discussed regarding that term, the Court finds that Defendant's construction improperly includes exemplary or optional language.  Accordingly, the Court adopts the following construction: "an enclosed space within a microfluidic device."

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

### G.    "an aperture" ('962, '933, '376, and '378 Patents)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Adopted Construction |
|---|---|---|
| Plain and ordinary meaning, no construction necessary | An "aperture" is an inlet or outlet that can be reversibly switched between an open position, to permit fluid to flow into or out of the chamber, and a closed position to seal the chamber and thereby isolate and retain its contents. An "aperture" may also be intermediate between the open and closed positions to allow some fluid flow. An "aperture" is not the surface opening of a microwell.

"An" aperture is one or more apertures. | Plain and ordinary meaning, excluding the surface opening of a microwell. |

This claim term involves three separate disputed issues.  First, Defendant argues that the '962 patent expresses a clear lexicographical definition of the word "aperture" as an "inlet or outlet" that is an "*adjustable* opening."  ECF No. 267 at 64 (emphasis in original).  Defendant argues that this supports its construction that the aperture "can be reversibly switched between an open position . . . and a closed position . . . . [or] an intermediate between the open and closed positions . . . ."  *Id.*  Plaintiffs argue that the '962 patent does not expressly define "aperture," and that Defendant's construction improperly imports limitations from certain embodiments disclosed in the specification while excluding others.  *See id.* at 67–69.

Here, the Court agrees with Plaintiffs that Defendant's proposed construction is overly narrow and unsupported by lexicography.  Defendant cites to the '962 patent's characterization of an "inlet" or an "outlet" which "may be characterized in a most general sense as an aperture that can be reversibly switched between an open position . . . and a closed position . . . ." in support of its proposal that an aperture must be an adjustable opening, ECF No. 267 at 64, but that paragraph lends more support to Plaintiffs' position.  The specification does not define "aperture"; rather, at best, it defines "inlet" and "outlet" generally as "apertures" that may be reversibly switched.  A POSITA, reading this characterization in the specification, would understand that, accordingly, the

United States District Court
Northern District of California

term "aperture" is a broader term than the narrower "inlet" or "outlet" which may be reversibly switched from an open or closed position.

Defendant also argues that the specification only discloses embodiments in which the aperture in question is a valve or sieve valve, and the "patentee uses the words 'aperture,' 'inlet/outlet,' and 'valve' interchangeably." ECF No. 267 at 66–67. While such use could support an argument that a patentee defined the term by implication, *see Abbott*, 696 F.3d at 1150, here the patentee has not used the term "aperture" "repeatedly, consistently, and exclusively" to depict a valve. Rather, the specification expressly states that "[a] person skilled in the art will understand, however, that a single aperture could function as *both an inlet and an outlet*." '962 patent at 14:46–48 (emphasis added). This statement is inconsistent with Defendant's position that "aperture" was implicitly defined to mean a valve; rather it supports Plaintiffs' contention that the plain meaning of an "aperture"—i.e., an opening—is a broad genus of which inlets, outlets, and valves are species.

Second, Defendant argues that the '962 patent's definition of an "aperture" excludes the surface opening of a microwell. Here the Court agrees with Defendant. Defendant's construction that an "aperture" is not the surface opening of a microwell is a clear example of disavowal by the patentee, and well supported by the intrinsic evidence. *See* '962 patent at 14:55–56 ("Furthermore, an aperture (i.e., inlet or outlet) as used herein is meant to exclude the surface opening of a microwell."). Plaintiffs' only response is that this is "not necessary to the construction nor is it relevant to the disputed issues between the parties and should therefore be excluded as surplusage." ECF No. 267 at 70. Clearly, the patentee thought otherwise, having chosen to include this negative limitation in the definition of the term. As such, the Court finds it appropriate to include in the construction.

Finally, Defendant argues that the Court should include in this construction the instruction that "an" aperture means "one ore more" apertures. *See* ECF No. 267 at 63. Plaintiffs do not substantively dispute this point, except to argue that it is redundant and unnecessary to include it in the construction. *See id.* at 70. Here, Plaintiffs have the better argument. It is uncontroversial that in patent parlance, "an" means "one or more." *See KCJ Corp v. Kinetic Concepts, Inc.*, 223

F.3d 1351, 1356 (Fed. Cir. 2000).  To the extent that Defendant argues that a "lay jury" may require such instruction "for their better comprehension," ECF No. 267 at 71, Defendant can raise that issue in connection with the preparation of jury instructions for trial.

For the foregoing reasons, the Court adopts the following construction: plain and ordinary meaning, excluding the surface opening of a microwell.

### H.   "exposing the secreted [] antibody to a [] removeable capture substrate" ('962, '933, and '376 Patents)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Adopted Construction |
|---|---|---|
| This phrase is not a claim term and is not appropriate for construction. This is an attempt to circumvent the N.D. Cal. Patent Local Rules and the 10-claim term limit agreed upon by the parties. The Court should not construe this phrase.<br><br>To the extent that the Court construes this phrase, it should be given the plain and ordinary meaning of its component terms. | "exposing the secreted antibody to a removeable capture substrate in the chamber in which the cell is retained" | Plain and ordinary meaning, no construction necessary |

Defendant argues that the Court should construe the claim language as requiring that the "exposing" of the "secreted antibody to a removeable capture substrate" must happen "in the chamber in which the cell is retained."  Essentially, Defendant makes yet another argument regarding written description and/or enablement, and asks this Court to import additional limitations from the specification to narrow the claim scope.  The Court has already rejected Defendant's attempt to do so in the context of the '936 patent, *see* Section IV(D), *supra*, and does so here for the same reasons.  Defendant points to no claim term that the patentee has defined lexicographically, either expressly or by implication.  Because "[i]t is improper for a court to add extraneous limitations to a claim . . . wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim[,]" *Hoganas*, 9 F.3d at 950 (internal quotation and citation omitted), the Court finds no construction necessary for this term.

United States District Court
Northern District of California

20

I.  **"exposing the secreted monoclonal antibody to a first removeable capture substrate, wherein first the removeable capture substrate is in fluid communication with the secreted monoclonal antibody" ('378 Patent)**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Adopted Construction |
|---|---|---|
| This phrase is not a claim term and is not appropriate for construction. This is an attempt to circumvent the N.D. Cal. Patent Local Rules and the 10-claim term limit agreed upon by the parties. The Court should not construe this phrase.<br><br>To the extent that the Court construes this phrase, it should be given the plain and ordinary meaning of its component terms.<br><br>The Court should correct the typographical error in the phrase "first the" to "the first." | "exposing the secreted [] antibody to a [] removeable capture substrate" means "exposing the secreted antibody to a removeable capture substrate in the chamber in which the cell is retained" | "exposing the secreted monoclonal antibody to a first removeable capture substrate, wherein the first removeable capture substrate is in fluid communication with the secreted monoclonal antibody" |

There are two disputes concerning this claim term.  First, Defendant argues that the phrase "exposing the secreted monoclonal antibody to a first removeable capture substrate" should be construed consistently with the '933 patent, as requiring the "exposing" of the secreted antibody to occur "in the chamber in which the cell is retained."  The Court has already rejected that proposed construction with regard to the '933 patent, *see* Section IV(H), *supra*, and does so here for the same reasons.

Second, Plaintiffs request that this Court correct a typographical error in the phrase "wherein first the removeable capture substrate is in fluid communication with the secreted monoclonal antibody," by changing the phrase "first the" to "the first. "A district court may correct obvious minor typographical and clerical errors in patents."  *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022).  "Correction is appropriate 'only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.'" *Id.* (quoting *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir.

2003)).  Defendant does not contest Plaintiffs' request to correct the error, except to assert, without

reasoning, that it "does not agree that 'first the' is a typographical error[.]"  ECF No. 267 at 88.

Because this issue is essentially uncontested, and the Court sees no indication in the specification

or prosecution history that would make Plaintiffs' request inappropriate, the Court adopts

Plaintiffs' proposal to correct "first the" to "the first" in this claim limitation.

### J.   "exposing a first fluid volume comprising the antigen in fluid communication with the bound antibody" ('378 Patent)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Adopted Construction |
| --- | --- | --- |
| This phrase is not a claim term and is not appropriate for construction. This is an attempt to circumvent the N.D. Cal. Patent Local Rules and the 10-claim term limit agreed upon by the parties. The Court should not construe this phrase.<br><br>To the extent that the Court construes this phrase, it should be given the plain and ordinary meaning of its component terms. | Indefinite | Plain and ordinary meaning, no construction necessary |

Defendant argues that the term "exposing a first fluid volume comprising the antigen in

fluid communication with the bound antibody" is indefinite, because it does not state *what* the first

fluid volume is exposed *to*, and as such fails to inform persons of skill in the art of the scope of the

purported invention with "reasonable certainty."  *See* ECF No. 267 at 91 (citing *Nautilus, Inc. v.*

*Biosig Instr., Inc.*, 572 U.S. 898, 910 (2014)).

A party arguing that a patent is invalid for indefiniteness bears the burden of proving

indefiniteness by clear and convincing evidence.  *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d

1360, 1365 (Fed. Cir. 2017); *see also Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 809

F.3d 1223, 1224 (Fed. Cir. 2015) (Moore, J., concurring) ("[T]he burden of proving indefiniteness,

as with any allegation of invalidity, remains on the party challenging validity who must establish it

by clear and convincing evidence.").  Defendant fails to meet that burden here.

Defendant's only argument for indefiniteness is that the claim language does not specify what the first fluid volume is *exposed to*, such that a person of ordinary skill in the art would understand the scope of the patent.  *See* ECF No. 267 at 92.  However, indefiniteness requires that the claims, "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.  Plaintiffs argue that, read in light of the specification, a "POSITA would understand the similarity of 'with' and 'to' and thus, the meaning of 'exposing a first fluid volume comprising the antigen in fluid communication with the bound antibody' in light of the claims and specification, i.e., the 'first fluid volume comprising the antigen' is exposed in fluid communication to or with the 'bound antibody.'"  ECF No. 267 at 93.

The Court finds Plaintiffs' common-sense interpretation of the claims sufficient for a POSITA to understand with reasonable certainty.  Claim 1 of the '378 patent also recites: "exposing the secreted monoclonal antibody to a first removeable capture substrate, wherein first the removeable capture substrate is in fluid communication with the secreted monoclonal antibody[.]"  Compared to that claim limitation, it is clear to the Court that this claim term was intended to mean "exposing a first fluid volume comprising the antigen [to the bound antibody, wherein the first fluid volume is] in fluid communication with the bound antibody."  Because the claim language is sufficient to inform a POSITA of the scope of the claim with reasonable certainty, the Court agrees with Plaintiffs that this claim term is not indefinite, and needs no construction.

## CONCLUSION

The Court construes the disputed claim language as follows:

| Term | Claim(s) | Court's Construction |
|------|----------|----------------------|
| "chamber" | '408 patent cl. 1, 2, 24, 26, 27; '936 patent cl. 1, 6, 9, 10, 16, 18, 20, 21; '270 patent cl. 1, 30 | "an enclosed space within a microfluidic device, having at least one inlet for permitting fluid to enter the chamber, at least one outlet to permit fluid to exit the chamber, and at least one cell retaining position." |

United States District Court
Northern District of California

United States District Court
Northern District of California

| Term | Claim(s) | Court's Construction |
|---|---|---|
| "inlet" | '408 patent, cl. 1; '936 patent cl. 1; '270 patent cl. 1 | "An aperture that permits fluid to enter a chamber. An inlet of a chamber cannot simultaneously be an outlet of the same chamber" |
| "outlet" | '408 patent, cl. 1 | "An aperture that permits fluid to exit a chamber. An outlet of a chamber cannot simultaneously be an inlet of the same chamber" |
| "wherein individual cells of the population are retained in unique microfluidic chambers . . . , and the cells are transported via the introduction port and flow channel into the unique microfluidic chambers" | '936 patent cl. 1 | Plain and ordinary meaning, no construction necessary |
| "cell trap" | '936 patent cl. 6 | Governed by 35 U.S.C. § 112(6)<br><br>"a means for receiving and retaining cells at a predetermined location over time."<br><br>Corresponding structure: 14:48-15:57; 34:15–35:22; 35:53–36:26; FIG. 3; FIG. 4. |
| "chamber" | '962 patent cl. 1; '933 patent cl. 1; '376 patent cl. 1, 12; '378 patent cl. 1 | "an enclosed space within a microfluidic device" |
| "an aperture" | '962 patent cl. 1; '933 patent cl. 1; '376 patent cl. 1; '378 patent cl. 1 | Plain and ordinary meaning, excluding the surface opening of a microwell. |
| "exposing the secreted [] antibody to a [] removeable capture substrate" | '962 patent cl. 1; '933 patent cl. 1; '376 patent cl. 1; '378 patent cl. 1 | Plain and ordinary meaning, no construction necessary |
| "exposing the secreted monoclonal antibody to a first removeable capture substrate, wherein first the removeable capture substrate is in fluid communication with the secreted monoclonal antibody" | '378 patent cl. 1 | "exposing the secreted monoclonal antibody to a first removeable capture substrate, wherein the first removeable capture substrate is in fluid communication with the secreted monoclonal antibody" |

| Term | Claim(s) | Court's Construction |
|------|----------|----------------------|
| "exposing a first fluid volume comprising the antigen in fluid communication with the bound antibody" | '378 patent cl. 1 | Plain and ordinary meaning, no construction necessary |

**IT IS SO ORDERED.**

Dated:  September 17, 2024



JON S. TIGAR
United States District Judge