Karen I. Boyd (State Bar No. 189808)
boyd@turnerboyd.com
Jennifer Seraphine (State Bar No. 245463)
seraphine@turnerboyd.com
Keeley I. Vega (State Bar No. 259928)
vega@turnerboyd.com
Marc David Peters (State Bar No. 211725)
mdpeters@turnerboyd.com
Vyson Hsu (State Bar No. 322336)
hsu@turnerboyd.com
Camilla M. Bykhovsky (State Bar No. 353732)
bykhovsky@turnerboyd.com
TURNER BOYD SERAPHINE LLP
155 Bovet Road, Suite 600
San Mateo, California 94402
Telephone: (650) 521-5930

*Attorneys for Defendant*
*Bruker Cellular Analysis, Inc.*

Courtland L. Reichman (CA Bar No. 268873)
creichman@reichmanjorgensen.com
Jennifer Estremera (CA Bar No. 251076)
jestremera@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401

Christine E. Lehman (*pro hac vice*)
clehman@reichmanjorgensen.com
Connor S. Houghton (*pro hac vice*)
choughton@reichmanjorgensen.com
Savannah H. Carnes (CA Bar No. 335438)
scarnes@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
1909 K Street NW, Suite 800
Washington DC, 20006
Telephone: (202) 894-7310

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| ABCELLERA BIOLOGICS INC. and THE UNIVERSITY OF BRITISH COLUMBIA,<br><br>Plaintiffs,<br><br>v.<br><br>BRUKER CELLULAR ANALYSIS, INC.,<br><br>Defendant. | Case No. 4:20-cv-08624-JST (VKD) (consolidated)<br><br>**BRUKER CELLULAR ANALYSIS, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST ABCELLERA BIOLOGICS INC. AND THE UNIVERSITY OF BRITISH COLUMBIA**<br><br>Date:  October 23, 2025<br>Time:  2:00 p.m.<br>Place:  Courtroom 6, 2nd Floor<br>Judge:  Honorable Jon S. Tigar |

## <u>REDACTED</u> VERSION OF DOCUMENT FILED UNDER SEAL

## NOTICE OF MOTION AND MOTION

Please take notice that on Thursday, October 23, 2025 at 2:00 p.m., or on another date determined by the Court, in the courtroom of the Honorable Jon S. Tigar in the United States District Court for the Northern District of California, Oakland Courthouse, Courtroom 6, 2nd Floor, 1301 Clay Street, Oakland, CA 94612, Defendant Bruker Cellular Analysis, Inc. ("BCA") will, and hereby does, move the Court for summary judgment against Plaintiffs AbCellera Biologics, Inc. ("AbCellera") and University of British Columbia ("UBC").

## RELIEF REQUESTED

BCA respectfully requests that the Court enter summary judgment in favor of BCA as follows:

(1) **Noninfringement of all claims in the '408 and '933 Families – "Enclosed Space":** That the accused NanoPens are not an "enclosed space" because they are permanently open to the main channel through a single fixed opening.

(2) **Noninfringement of all claims in the '408 Family – "Inlet"/"Outlet":** That the accused NanoPens do not meet the "inlet" and "outlet" requirements for a "chamber" under the Court's construction.

(3) **Noninfringement of all claims in the '933 Family – "Aperture":**  That the openings of NanoPens are not "apertures" under the Court's construction, and Plaintiffs are judicially estopped from contradicting their arguments made during IPR.

(4) **AbCellera does not practice the Asserted Patents:**  That AbCellera's antibody discovery methods do not practice any asserted claims of the '408 or '933 patent families because they exclusively use microwell array chips consisting of open recesses with a single surface opening, and therefore cannot satisfy the Court's constructions of "chamber," "inlet," "outlet," and "aperture."

(5) **No indirect or willful infringement for all Asserted Patents:** That BCA did not have the required knowledge of the Asserted Patents and its alleged infringement to prove either indirect infringement or willful infringement.

(6) **No contributory infringement for all Asserted Patents:**  That because of the many uses for the accused system other than antibody discovery, the accused system has substantial noninfringing uses, which precludes a finding of contributory infringement.

1

**TABLE OF CONTENTS**

2
                                                                                    Page No.

3    STATEMENT OF FACTS ........................................................................................1

4    ARGUMENT .......................................................................................................2

5    I.    PLAINTIFFS CANNOT ESTABLISH DIRECT INFRINGEMENT....................................2

6         A.    No Reasonable Jury Could Find that Open-Ended NanoPens are "Enclosed,"
               When Plaintiffs' Only Evidence is Conclusory Expert Testimony. .......................3
7
8         B.    No Reasonable Jury Could Find the "Inlet"/"Outlet" Required by the '408
               Family ...................................................................................................6

9              1.    A single opening fails the requirement for two separate apertures..............7

10             2.    Plaintiffs' "Across-the-Channel" theory was never disclosed and fails
                    the "enclosed space" requirement. ..............................................9
11
12             3.    Plaintiffs' "Chip Inlet/Outlet" theory fails because the identified
                    "inlet"/"outlet" are far removed from the identified "chamber." ..............10

13             4.    Plaintiffs' row-level "Inlet"/"Outlet" theory fails for the same reason. ....12

14        C.    No Reasonable Jury Could Find the "Chamber Having . . . an Aperture"
               Required by the '933 Family. ...................................................................12
15
16             1.    UBC's IPR position was that picoliter-sized wells are microwells; it
                    now argues the opposite..........................................................14

17             2.    The Board accepted UBC's arguments about Park's microwells...............15

18             3.    Plaintiffs' about-face on "microwell" gives it an unfair advantage...........15

19   II.   ABCELLERA DOES NOT PRACTICE THE ASSERTED PATENTS ...........................16

20   III.  PLAINTIFFS CANNOT ESTABLISH INDIRECT OR WILLFUL INFRINGEMENT ....19

21   IV.   PLAINTIFFS ALSO CANNOT PROVE CONTRIBUTORY INFRINGEMENT.............24

22   CONCLUSION....................................................................................................25

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page No.

## **Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................................................6

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
   876 F.3d 1350 (Fed. Cir. 2017).....................................................................................20

*Azod v. Robinson*,
   No. 22-56186, 2024 WL 163371 (9th Cir. Jan. 16, 2024).............................................15

*Commil USA, LLC v. Cisco Sys., Inc.*,
   575 U.S. 632 (2015)......................................................................................................20

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
   616 F.3d 1357 (Fed. Cir. 2010).....................................................................................22

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011)......................................................................................................24

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
   438 F.3d 1354 (Fed. Cir. 2006).....................................................................................24

*GPNE Corp. v. Apple, Inc.*,
   2014 WL 1390039 (N.D. Cal. Apr. 9, 2014) ..................................................................5

*Hamilton v. State Farm Fire & Cas. Co.*,
   270 F.3d 778 (9th Cir. 2001) ...................................................................................14, 15

*Hernandez v. Spacelabs Med. Inc.*,
   343 F.3d 1107 (9th Cir. 2003) ...................................................................................3, 13

*Hewlett Packard Enter. Co. v. Inspur Grp. Co.*,
   No. 24-CV-02220-JST, 2025 WL 754265 (N.D. Cal. Mar. 10, 2025) ......................22, 23

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*,
   681 F.3d 1323 (Fed. Cir. 2012).....................................................................................25

*Intellectual Sci. & Tech. Inc. v. Sony Elecs., Inc.*,
   589 F.3d 1179 (Fed. Cir. 2009).......................................................................................2

*Invitrogen Corp. v. Clontech Labs., Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005)...................................................................................4, 5

*Johnston v. IVAC Corp.*,
   885 F.2d 1574 (Fed. Cir. 1989)...............................................................................3, 5, 13

*MasterObjects, Inc. v. Amazon.com, Inc.*,
   No. C 20-08103 WHA, 2021 WL 468530 (N.D. Cal. Oct. 7, 2021) ..............................22

*Midwest Energy Emissions Corp. v. Vistra Energy Corp.*,
   No. CV 19-1334-RGA-CJB, 2020 WL 3316056 (D. Del. June 18, 2020) ..............................21

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ..............................................................................................................15

*Pehr v. Rubbermaid, Inc.*,
   87 F. Supp. 2d 1222 (D. Kan. 2000) ....................................................................................11

*SanDisk Corp. v. STMicroelectronics, Inc.*,
   480 F.3d 1372 (Fed. Cir. 2007)............................................................................................22

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008)....................................................................................3, 5, 13

*Sonos, Inc. v. Google LLC*,
   591 F. Supp. 3d 638 (N.D. Cal. 2022) ................................................................................23

*Traxcell Techs. LLC v. Google LLC*,
   No. 22-CV-04807-JSC, 2022 WL 17072015 (N.D. Cal. Nov. 17, 2022)............................23

*Virgin Atl. Airways Ltd. v. Delta Air Lines, Inc.*,
   No. CIV.A. 11-61-LPS-CJB, 2012 WL 1248901 (D. Del. Apr. 12, 2012) ............................11

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009)............................................................................................25

*VLSI Tech. LLC v. Intel Corp.*,
   706 F. Supp. 3d 953 (N.D. Cal. 2023) ............................................................................20, 23

*X One, Inc. v. Uber Techs., Inc.*,
   No. 16-CV-06050-LHK, 2017 WL 3581184 (N.D. Cal. Aug. 18, 2017)..............................11

*Yanez v. United States*,
   989 F.2d 323 (9th Cir. 1993) ................................................................................................16

**Statutes**

35 U.S.C. § 271(c) ..........................................................................................................................25

BCA seeks summary judgment on four issues:  (1) infringement of all Asserted Patents; (2) AbCellera's practice of the Asserted Patents; (3) indirect and willful infringement; and (4) contributory infringement.  None present triable issues of fact and summary judgment is warranted.

### STATEMENT OF FACTS

This is a patent case about a laboratory instrument that can manipulate single cells for scientific experiments.  BCA developed the Beacon, a machine about the size of a large refrigerator, for applications in antibody discovery, developing new cell lines, synthetic biology, and more.  The Beacon allows scientists to run thousands of experiments simultaneously on individual cells.

These experiments run on proprietary microfluidic chips called OptoSelect chips.  Each OptoSelect chip is roughly the size of a postage stamp and has a main channel that snakes back and forth across the chip.  OptoSelect chips have a chip inlet at the start of the main channel and a chip outlet at the end of the main channel, which connect to tubing that supplies fluids and other materials like cells and beads to the main channel.  An image of an OptoSelect chip is shown below:



Ex. 20 (BLI00155763 at BLI00155775).  Perpendicular to the main channel are thousands of tiny recesses called NanoPens.  NanoPens can be seen more clearly in this further magnified image:



1  Ex. 1 (Wereley Rebuttal Report) at ¶ 117 (citing BLI00172121 at BLI00172138). NanoPens are tiny,

2  open-ended recesses adjacent to the main channel. Each has a single, fixed opening to the main

3  channel. They are used to isolate and observe individual cells and/or polystyrene beads, depending

4  on the experiment (also called a "workflow"). But because NanoPens are dead-end channels, as seen

5  above, fluid does not flow through them and so placing individual cells inside them is a challenge.

6  BCA overcame this challenge of microfluidics with its proprietary optoelectro positioning ("OEP")

7  technology. OEP uses light to move individual cells from the main channel into NanoPens, and back

8  out again. *Id.* ¶ 61. Once a cell is loaded into a NanoPen, scientists can run many experiments using

9  different BCA workflows.

10  Plaintiffs accuse BCA's Beacon system—comprising a machine, chip, and workflow—of

11  infringing six patents across two families (collectively, the "Asserted Patents"). These are the '408

12  patent family (U.S. Patent Nos. 10,087,408; 10,421,936; and 10,738,270), which concerns methods

13  for culturing a cell; and the '933 patent family (U.S. Patent Nos. 10,753,933; 10,775,376; and

14  10,775,378), which concerns methods for assaying antibody-antigen binding.

15  ## ARGUMENT

16  Summary judgment is appropriate when "there is no genuine dispute as to any material fact

17  and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp.*

18  *v. Catrett*, 477 U.S. 317, 322 (1986). Where the party moving for summary judgment would not bear

19  the burden of proof at trial, that party "must either produce evidence negating an essential element of

20  the nonmoving party's claim or defense or show that the nonmoving party does not have enough

21  evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire &*

22  *Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

23  ## I.    PLAINTIFFS CANNOT ESTABLISH DIRECT INFRINGEMENT

24  To survive a motion for summary judgment of noninfringement, "a patentee's expert must set

25  forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain

26  that features of the accused product would support a finding of infringement under the claim

27  construction adopted by the court[.]" *Intellectual Sci. & Tech. Inc. v. Sony Elecs., Inc.*, 589 F.3d

28  1179, 1183 (Fed. Cir. 2009). "Conclusory expert assertions cannot raise triable issues of material fact

1    on summary judgment." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008).

2        **A.    No Reasonable Jury Could Find that Open-Ended NanoPens are "Enclosed,"
        When Plaintiffs' Only Evidence is Conclusory Expert Testimony.**

4        Plaintiffs cannot establish direct infringement for any claim of any patent because they have

5    no evidence showing that the accused OptoSelect chips include the required enclosed chambers.  For

6    both the '408 and '933 families, the Court construed "chamber" to mean, "an enclosed space within

7    a microfluidic device."[1]  ECF No. 282 at 4, 17.  Plaintiffs' infringement theory rests on the premise

8    that each NanoPen is the claimed "chamber," but it fails at the outset because it cannot establish that

9    the NanoPen is an "enclosed space."

10        As shown in the image above, each NanoPen has a single, fixed opening to the main channel

11    and so is never an "enclosed space."  This is confirmed by the plain meaning of "enclosed" as

12    "surrounded by walls, objects, or structures," or "completely surrounded by something, esp a wall or

13    similar barrier."[2]  It is undisputed that the NanoPen interior is not completely surrounded by walls

14    because it has a surface opening to the channel.  Accordingly, the OptoSelect chips cannot infringe

15    any of the asserted claims.

16        To avoid summary judgment, Plaintiffs must provide sufficient evidence to allow a reasonable

17    jury to find that every limitation of the asserted claims is met; conclusory expert assertions are not

18    enough.  *E.g.*, *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1578 (Fed. Cir. 1989) (affirming summary

19    judgment of no infringement and explaining "[g]eneral assertions of fact issues, general denials, and

20    conclusory statements are insufficient to shoulder the non-movant's burden."); *Hernandez v.

21    Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (Nonmoving parties "cannot defeat

22    summary judgment . . . with unsupported conjecture or conclusory statements."); *Sitrick*, 516 F.3d at

23    1001 ("Conclusory expert assertions cannot raise triable issues of material fact on summary

24    ─────────────────────

25    [1] The Court's construction of "chamber" for the '408 family has additional detail: "having at least one
    inlet for permitting fluid to enter the chamber, at least one outlet to permit fluid to exit the chamber,
26    and at least one cell retaining position."  ECF No. 282 at 4.

27    [2] Cambridge Dictionary, *enclosed*, https://dictionary.cambridge.org/us/dictionary/english/enclosed
    (last visited Aug. 19, 2025); Collins English Dictionary, *enclosed*, https://www.collinsdictionary.com
28    /us/dictionary/english/enclosed (last visited Aug. 19, 2025).

judgment."); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005) (affirming summary judgment where opinion was speculative).

Plaintiffs' evidence that NanoPens are an "enclosed space" falls far short of establishing a genuine factual dispute. Their only record evidence on this point is the opinion of their expert Dr. Landers, which provides no evidentiary support that the NanoPens satisfy the "enclosed space" requirement. Landers addresses whether a NanoPen qualifies as an "enclosed space" in a single sentence in his infringement analysis, where he writes:

> In my opinion, NanoPen chambers are "chambers" as construed by the Court. Bruker's documents explain that an individual NanoPen chamber of an OptoSelect Chip is an enclosed space within a microfluidic device that is used to isolate and retain a cell or clonal population thereof at a retaining position.

Ex. 2 (Landers Report) ¶ 107. Landers offers no reasoning or technical explanation as to why NanoPens are "enclosed spaces." He provides no definition of what "enclosed" means to a person of ordinary skill in the art ("POSITA"), no discussion of what structural features satisfy the term, no explanation for how a permanently open NanoPen could plausibly be considered an "enclosed space." He simply declares it so. That is unsupported conjecture and cannot create a genuine dispute of material fact.

Landers's cited evidence also cannot create a genuine dispute. He string-cites six pages of six BCA documents, but none state NanoPens are "enclosed," or even use the term. *See* Ex. 3 (collecting cited pages). Landers never ties these documents to the "enclosed space" requirement or explains how they relate to his conclusion. *See* Ex. 2 ¶ 107.[3] Three are cited with no commentary at all. The other three contain parentheticals quoting marketing language that refers to "NanoPen chambers" or to a "microfluidics" platform. But using the word "chamber" in a marketing document, well before

---

[3] The string cite is: *See, e.g.*, BLI00113269 at BLI00113273 (Opto Memory B Discovery Human Workflow application note); BLI00242811 at BLI00242820 (Opto B Discovery overview presentation); BLI00824532 at BLI00824534 (Berkeley Lights/ Novartis B-cell Program Report); BLI00000508-564 at BLI00000514 ("Opto™ Plasma B Discovery 2.0 Workflow" User Manual, "Plasma B cells are isolated as single cells in NanoPen chambers, or 'pens' on OptoSelect 11k chips."); BLI01080553 at BLI01080553 (Monoclonality on the Beacon poster from 2018, "The OptoSelect ® nanofluidic chip contain thousands of . . . chambers, known as NanoPen® chambers, or 'pens'"); BLI00789422 at BLI00789439 (Opto B Discovery overview presentation from Apr. 3, 2024, "Finally, our platform leverages microfluidics . . .."). The cited pages are collected as Exhibit 3.

the Court ever construed the term, is not probative of whether a NanoPen satisfies the Court's construction.  The marketing documents are silent on the key requirement that a "chamber" be "enclosed" and instead highlight the NanoPen's permanently open structure.  Evidence must show that the NanoPen satisfies the claim limitations, not just that BCA uses the same word in another context.  These citations do not provide meaningful support for Landers's conclusory statement.

The rest of Landers's report similarly fails to analyze "enclosed space."  Instead of analyzing what "enclosed" means or how the NanoPens purportedly meet that requirement, Landers merely addresses a different requirement: whether the NanoPen has both an "inlet" and an "outlet", or an "aperture."  *See* Ex. 2 ¶¶ 119-120, 133, 137, 153, 177, 185,  224.  Landers's analysis does not engage with the "enclosed" requirement or explain how a POSITA could conclude that the NanoPen's open geometry satisfies that requirement.

Plaintiffs have only "[c]onclusory expert assertions," which "cannot raise triable issues of material fact on summary judgment."  *See Sitrick*, 516 F.3d at 1001 (affirming grant of summary judgment where plaintiff's expert offered opinion "unsupported by any actual information").  For example, in *Invitrogen*, the Federal Circuit affirmed summary judgment of no infringement where the expert offered no explanation for a key assumption and cited no theory or data to support it.  429 F.3d at 1080.  Similarly, in *Johnston*, the Federal Circuit found that a one-sentence opinion on a limitation was "wholly insufficient to raise a genuine evidentiary dispute for a jury."  885 F.2d at 1578.  And the court in *GPNE Corp. v. Apple, Inc.*, rejected an expert's opinion that merely parroted the claim language and followed it with a conclusory assertion, with no explanation of how a POSITA could understand the limitation to be met.  *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1390039, at *11 (N.D. Cal. Apr. 9, 2014).  Landers's treatment of "enclosed space" is the same: he recites the claim language and declares that it is satisfied.  *See* Ex. 2 ¶ 107.  He cites documents but does not explain their relevance and offers no explanation of why a POSITA could think a NanoPen is an "enclosed space."  That is precisely the kind of conclusory opinion that fails as a matter of law.

The record contains no other evidence from which a jury could reasonably conclude that the NanoPen is an "enclosed space."  Both sides agree that the NanoPen is permanently open to the main channel via a single fixed opening.  *See id.* ¶ 111 (image of NanoPen).  The only dispute is whether

such an open structure qualifies as "enclosed." BCA's expert engages with that question, even though it is not BCA's burden: he explains, relying on dictionary definitions, figures, engineering principles, and citations to the asserted patents and to BCA's own patent, why a POSITA would consider the NanoPen to be open and not enclosed. Ex. 1 ¶¶ 114-122. Plaintiffs' expert offers no competing explanation; he simply declares that the NanoPen is enclosed, without saying why. That is not a genuine dispute under Rule 56. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *Invitrogen*, 429 F.3d at 1080 ("A party does not manufacture more than a merely colorable dispute simply by submitting an expert declaration asserting that something is black when the moving party's expert says it is white; there must be some foundation or basis for the opinion."). A bare "yes" cannot overcome a reasoned "no." Summary judgment is appropriate on noninfringement for all claims.

### B. No Reasonable Jury Could Find the "Inlet"/"Outlet" Required by the '408 Family

Separately, summary judgment of noninfringement is proper for every claim in the '408 family because the accused OptoSelect chips do not have "inlets" and "outlets." The Court's construction foreclosed any infringement argument that treats a single "chamber" opening as serving the role of both "inlet" and "outlet," or that separates the "inlet" or "outlet" from the "chamber" itself. Yet Plaintiffs' infringement arguments do just that.

All asserted claims in the '408 family require a "chamber," which is "an enclosed space within a microfluidic device, having at least one inlet for permitting fluid to enter the chamber, [and] at least one outlet to permit fluid to exit the chamber[.]" ECF No. 282 at 4. The Court construed "inlet" to be "an aperture that permits fluid to enter a chamber" and "outlet" to be "an aperture that permits fluid to exit a chamber." *Id.* at 24. The Court held that an inlet "cannot simultaneously be an outlet of the same chamber," and vice versa, and that this requires "each chamber have both an 'inlet' and 'outlet' that are separate apertures." *Id.* at 10, 24.

Plaintiffs offer four divergent theories to argue the accused NanoPen "chambers" have both "inlets" and "outlets." The first theory labels the same single opening as simultaneously the "inlet" and "outlet"; the second theory is inadmissible for late disclosure and also fails to satisfy the "enclosed

space" requirement of "chamber"; and the third and fourth theories position the "inlet" and "outlet" far away from the "chamber." No theory satisfies the claimed "inlet" and "outlet," so no reasonable jury could find infringement for any asserted claim in the '408 family.

### 1. A single opening fails the requirement for two separate apertures.

Plaintiffs' primary infringement theory for the '408 family fails because it points to a single opening as being both the "inlet" and "outlet"—even though the Court held that the "inlet" and "outlet" cannot be "the same aperture or opening." ECF No. 282 at 10. Landers identifies the NanoPen as the claimed "chamber," and as shown to the right, opines that different portions of the NanoPen's single opening are an "inlet area" and an "outlet area." Ex. 2 ¶ 111. No reasonable jury could find that its single opening could be both "inlet" and "outlet" because the Court's construction requires at least two openings.



Landers avoids confronting this problem. Landers does not dispute that the NanoPen has one and only one opening. He agrees that the plain and ordinary meaning of "an aperture" is "an opening," and he asserts that the NanoPen's single opening is an aperture on that basis. Ex. 2 ¶ 224. In discussing his infringement opinions of the '408 family, he never uses the word "aperture," except to quote the Court's constructions of "inlet" and "outlet," despite it being a necessary element of the asserted claims. Rather, he relies on vague labels like "inlet areas" and "outlet areas" to describe two regions of a single opening. Ex. 2 ¶ 111, *see also* ¶ 112 ("inlet position" and "outlet position"). Renaming areas of a single aperture does not satisfy the requirement for two separate apertures.

The only potential dispute is whether a single opening or aperture can simultaneously be both an "inlet" and an "outlet," but the Court expressly construed "inlet" and "outlet" as apertures that "**cannot** simultaneously" be the other. ECF No. 282 at 8, 11 (emphasis added). The Court repeatedly held that the claimed "chamber" must have "*both* an 'inlet' and 'outlet' that are separate apertures." *Id.* at 10-11, 24; *e.g.*, *id.* at 9 ("[E]ach chamber must have a **separate** 'inlet' and 'outlet.'"); *id.* at 10 ("[T]he 'inlet' and 'outlet' must be **separate**"), ("[T]he 'inlet' and 'outlet' are still not simultaneously

the same aperture or opening"), ("[T]he patentee, *in the context of the '408 family,* intended for the 'inlet' and 'outlet' to refer to **separate apertures**.") (bolding added).

This Court's construction leaves no room for Plaintiffs' infringement argument. A NanoPen has one opening, an opening is an aperture, thus the NanoPen has one aperture. *See* Ex. 2 ¶ 224 (Landers opining that NanoPens have "an aperture," and that its plain and ordinary meaning is "an opening"). The Court's construction requires "a separate 'inlet' and 'outlet'" that are "not simultaneously the same aperture or opening." *See* ECF No. 282 at 9, 10. A chamber having a single aperture is therefore not the "chamber" of the '408 patent family.

Plaintiffs already lost this argument at claim construction. There, they argued that "different portions of an aperture" could act as an "inlet" and "outlet." ECF No. 267 at 36. The Court rejected that argument as "unconvincing," noting that the specification's use of "upstream" and "downstream" to describe inlets and outlets would make no sense if those terms referred to different regions of a single aperture. ECF No. 282 at 9-10. That is exactly the theory Landers now attempts to revive: that one aperture can simultaneously be two. The Court's ruling forecloses that approach.

This first theory fails for an independent reason. The Court's construction of "inlet" and "outlet" requires that fluid moves in only one direction: the "inlet" "permits fluid to enter the chamber" and the outlet "permits fluid to exit the chamber." ECF. No. 282 at 24. Because "an inlet cannot simultaneously be an outlet," and vice versa, fluid cannot *exit* the "inlet" and cannot *enter* the "outlet." *See id*. Thus, the claims require one-way fluid movement through the chamber: in through the chamber inlet and out through the chamber outlet. But there is no flow through a NanoPen, only diffusion into and out of it.

The parties agree that fluid enters and exits the single opening of the NanoPen through diffusion. As Landers puts it, BCA's documents "instruct that media is 'perfused' through the OptoSelect chip and that media is at least partially **exchanged** via diffusion" and that "mass transport from the channel **to and from** the NanoPen is by **diffusion**." Ex. 2 ¶ 128 (emphasis added). He quotes documents that explain "Nutrients diffuse into [Nano]pens" and "Waste products diffuse out of the [Nano]pens." *Id.* Similarly, BCA's technical expert explains that diffusion "by definition, is a bidirectional and passive process" governed by random molecular motion. Ex. 1 ¶¶ 139, 142.

Plaintiffs cannot genuinely dispute this basic principle of fluid mechanics.

Movement of fluid molecules by diffusion is incompatible with the claim language. At any moment, molecules enter and exit the NanoPen across the entirety of the single opening. *See* Ex. 2 ¶ 128. Under Landers's theory, one "area" of that opening is labeled an "inlet," and another an "outlet," but diffusion does not respect those labels. Nutrients and waste move through every part of the opening simultaneously, in both directions. That means the so-called "inlet" is simultaneously serving as an "outlet," and vice versa, in contradiction of the Court's construction. Because Plaintiffs cannot identify distinct inlet and outlet apertures that function in opposite directions, it cannot meet the claim's directional flow requirement. No reasonable jury could find otherwise.

For these two reasons, Plaintiffs' first inlet/outlet theory does not create a triable issue of fact.

### 2. Plaintiffs' "Across-the-Channel" theory was never disclosed and fails the "enclosed space" requirement.

As a threshold issue, Plaintiffs' second infringement theory of an expanded chamber that extends across the main channel was not properly disclosed and should therefore be barred under Rule 37, as discussed in BCA's pending motion to strike. *See* ECF No. 381. Because "undisclosed theories are barred from presentation at trial (whether through expert opinion testimony or otherwise)," they cannot be used to create a genuine dispute of material fact. *See Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733-JST, 2021 WL 9038509, at *2 (N.D. Cal. Apr. 27, 2021) (cleaned up); *Unicorn Energy AG v. Tesla Inc.*, 740 F. Supp. 3d 930, 966-68 (N.D. Cal. 2024) (granting summary judgment of no infringement where plaintiff relied on undisclosed theories).

On the merits, no reasonable jury could find this new theory satisfies the Court's construction of "chamber." Under this "across-the-channel" theory, Landers now defines the "inlet" and "outlet" as the portion of the main channel extending from the edge of the NanoPen's opening to the wall on the far side of the channel. The "chamber" is thus the combination of the NanoPen and the adjacent portion of the flow channel, i.e., the space between the red and blue annotations in Landers's image here. Ex. 2 ¶¶ 119-23.



1    Stretching the "chamber" across the full width of the main channel destroys any argument for

2   a NanoPen being an "enclosed space" because it is even more open than the NanoPens themselves.

3   Landers does not dispute the fact that the flow channel is an uninterrupted, continuous channel and

4   that there are no structural or physical boundaries at the purported "inlet" or "outlet."  He does not

5   explain why such an exposed "chamber" could be considered an "enclosed space" under the claims;

6   he merely declares it so.  Ex. 2 ¶¶ 121-23; *see supra* n.3.  His conclusory opinion that this expanded

7   chamber is "enclosed" is insufficient to defeat summary judgment.  *See, e.g.*, *Hernandez*, 343 F.3d at

8   1112 (Nonmoving parties "cannot defeat summary judgment . . . with unsupported conjecture or

9   conclusory statements.").  No reasonable jury could conclude that from the record, either.  *See* Ex. 1

10  ¶¶ 147, 114-22 (BCA's expert detailing why it is not an "enclosed space").

11    This theory should be stricken because it was not disclosed.  Even if considered, this theory

12  fails to create a triable issue of fact because this expanded chamber is not an "enclosed space."

### 3.    Plaintiffs' "Chip Inlet/Outlet" theory fails because the identified "inlet"/"outlet" are far removed from the identified "chamber."

15    Plaintiffs' third theory identifies the chip's global

16  inlet and outlet as the required "inlet"/"outlet"—

17  contradicting the Court's construction that the "inlet" and

18  "outlet" be part of the identified "chamber."  Under this

19  theory, Landers treats the individual NanoPens as the

20  "chambers" but identifies the OptoSelect chip's single chip

21  inlet and single chip outlet as the claimed "inlet"/"outlet"



22  of each of the thousands of NanoPen "chambers."  *See* Ex. 2 ¶ 124.  That is, Landers identifies the

23  single entrance point for fluid at the ultimate start of the flow channels as the "inlet" and the single

24  exit point for fluid at the ultimate end as the "outlet."

25    No reasonable jury could find infringement under this theory because it is foreclosed by the

26  Court's constructions.  Each "chamber" must be "an enclosed space within a microfluidic device,

27  having at least one inlet . . . [and] at least one outlet[.]"  ECF No. 282 at 4.  The grammatical structure

28  is important: the phrase "having at least one" inlet/outlet modifies "an enclosed space," meaning the

inlet and outlet must be structural features of the chamber itself—directly connected so that fluid enters the "chamber" through its "inlet" aperture and exits through its "outlet" aperture.  The word "having" confirms that the inlet and outlet are part of the chamber itself.  Plaintiffs' theory that the chip inlet and outlet are the claimed "inlet" and "outlet" ignores this construction because none of its purported "chambers" **have** the chip inlet and chip outlet.

The claim construction order confirms this simple logic.  It relied on the specification's statements that "[e]ach chamber will have" an inlet and an outlet as "an explicit characterization of all of the chambers in the invention."  ECF No. 282 at 7 (quoting *X One, Inc. v. Uber Techs., Inc.*, No. 16-CV-06050-LHK, 2017 WL 3581184, at *14 (N.D. Cal. Aug. 18, 2017)).  The Court explained that "the patentee chose to define 'chamber' in a way that incorporates other claim terms such as 'inlet' and 'outlet,'" and that the specification's definition of "first region" as "a region of the chamber . . . interposed between the inlet and outlet positions" "would make no sense unless **each chamber** must **have** a **separate** 'inlet' and 'outlet.'"  *Id.* at 9 (emphasis added).  The inlet and outlet are "mandatory features of the 'chamber,'" further confirming the inlet/outlet are components of the "chamber" itself.  *Id.* at 7.

The Court's requirement that each chamber have its own inlet and its own outlet follows how courts interpret "X having Y" in patent claims.  *See Pehr v. Rubbermaid, Inc.*, 87 F. Supp. 2d 1222, 1228, 1232 (D. Kan. 2000) ("having" means "to hold, include, or contain as a part or whole"; "X having Y" requires Y to be part of X's structure, not merely elsewhere in a larger assembly; granting summary judgment of no infringement on this basis); *Virgin Atl. Airways Ltd. v. Delta Air Lines, Inc.*, No. CIV.A. 11-61-LPS-CJB, 2012 WL 1636147, at *11 (D. Del. Apr. 27, 2012) ("[T]he concepts of 'having' and 'including' are interchangeable," both denoting components of structure).

Landers's "chip inlet/outlet" theory makes the same mistake as in *Pehr*: it points to structures elsewhere in the chip (the ones that enable connection of the Beacon's fluidic lines to the chip) and attributes them to a different structure (individual NanoPens).  But under the Court's construction, the inlet and outlet must be part of the chamber itself as "mandatory features."  *See* ECF No. 282 at 7.  While the OptoSelect chip as a whole may "have" an inlet and outlet, the thousands of individual NanoPens do not.  This theory does not create a triable issue of fact.

**4.      Plaintiffs' row-level "Inlet"/"Outlet" theory fails for the same reason.**

Plaintiffs' fourth theory that each row of NanoPens shares a single "inlet" and "outlet" similarly fails because no individual "chamber" has both an "inlet" and "outlet." Plaintiffs again treat each NanoPen as the "chamber," but now



identify the inlet and outlet for that chamber at the "row" level. That is, this theory is that each NanoPen in a given row on the OptoSelect chip shares the same "inlet" and "outlet" at the start and end of that row. Ex. 2 ¶ 126.

This theory fails for the same reason as Plaintiffs' chip "inlet"/"outlet" theory: no chamber "has" an "inlet" and an "outlet." The claims require each chamber to be "an enclosed space within a microfluidic device having at least one inlet . . . [and] at least one outlet," meaning each chamber must contain its own inlet and outlet apertures. *See* ECF No. 282 at 4. Row-level "inlets" and "outlets" are not structural features of any NanoPen, and no NanoPen has both an "inlet" and "outlet." Because this theory locates the "inlet"/"outlet" outside the alleged "chamber," no reasonable jury could find that any NanoPen satisfies the claim requirements and there is no triable issue of fact.

Because none of Plaintiffs' four inlet/outlet theories creates a triable issue of fact, partial summary judgment of no infringement of the claims of the '408 patent family should be granted.

**C.      No Reasonable Jury Could Find the "Chamber Having . . . an Aperture" Required by the '933 Family.**

There is no genuine dispute that BCA's NanoPens are microwells having a single surface opening, and thus cannot satisfy the "chamber having . . . an aperture" limitation found in every claim of the '933 family. NanoPens are tiny, open-ended recesses adjacent to the main channel. Each has a single, fixed opening to the main channel. They are used to isolate and observe individual cells and/or polystyrene beads, Plaintiffs cannot create a genuine dispute of material fact for the '933 family because its sole theory on what constitutes a "microwell" directly contradicts the position it

took in an IPR. Its infringement theory should therefore be judicially estopped.

All claims of the '933 family require a chamber having "an aperture." The Court construed "aperture" to have its plain and ordinary meaning but "excluding the surface opening of a microwell." ECF No. 282 at 18-19. If a well is not a "microwell" it cannot be in this carve-out. The word "microwell" was not itself construed, not being part of the claim.

BCA's technical expert opined that the NanoPen is a microwell with a surface opening, and thus does not meet the definition of "chamber" in the '933 patent family. He concluded that the NanoPen is a microwell by considering a wide variety of evidence, including scientific publications and AbCellera documentation. Ex. 1 ¶¶ 277-96. For example, BCA's technical expert explained that "microwells" typically have one surface opening and are bounded on all other sides, and that they come in a variety of shapes and sizes. *Id.* at ¶¶ 277-78. He explained that the "micro" in "microwell" just means "small," as evidenced by multiple scientific papers using "microwell" to reference nanoliter or picoliter-sized volumes (both of which are smaller than a microliter). *Id.* at ¶¶ 277-96. BCA's expert explains that NanoPens meet this definition of a "microwell" because NanoPens have a single fixed opening and observed that ████████████████████████████████ ██████████████████████ (quoting AbCellera CEO Carl Hansen). Plaintiffs' expert Landers did not consider any of this evidence, and instead opines that NanoPens are not microwells because they are too small. He opines that "microwell" is limited to "a plate array or microtiter device that would generally hold and contain microliter (µL) levels of fluid," relying on a single paper for his definition—but the paper does not define "microwell" or distinguish "microwells" based on volume. *See* Ex. 2 ¶ 225; *contra* Ex. 21 (BLI00009951). This unsupported expert assertion cannot create a genuine dispute on whether a NanoPen is a "microwell" with a surface opening. *See, e.g.*, *Johnston*, 885 F.2d at 1578; *Hernandez*, 343 F.3d at 1112; *Sitrick*, 516 F.3d at 1001.

Plaintiffs' definition of "microwell" is not only conclusory, but is also barred under the doctrine of judicial estoppel because it contradicts the position UBC took in a prior IPR. In the '408 IPR, UBC took the position that a prior art reference with 25 picoliter wells had "microwells." 25 picoliters is 1/40,000 the volume of a microliter. The Board agreed with UBC's arguments on that prior art, and the patent survived. Now, to prove infringement, Plaintiffs argue the opposite: they

argue that "microwells" must contain *micro*liter volumes and thus the tiny NanoPens are not in the carve-out from the construction of aperture that excludes microwells.  Under this definition of "microwell," the '408 IPR prior art does *not* disclose microwells (even though the reference uses the word "microwells" repeatedly).  Plaintiffs' current infringement position would exclude the very microwells that UBC cited to survive the IPR.

This is precisely the type of about-face that judicial estoppel forbids.  Judicial estoppel is an equitable doctrine that precludes a party from "gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position" in a different case.  *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).  Courts typically consider whether the later position is "clearly inconsistent" with its earlier position; whether the first tribunal "accepted" or relied on the earlier position; and whether the change would create unfairness.  *Id.* at 782-83.  Each factor supports estoppel here.

### 1. UBC's IPR position was that picoliter-sized wells are microwells; it now argues the opposite.

Plaintiffs' infringement theory depends on arguing the NanoPen opening is not the "surface opening of a microwell."  *See* ECF No. 282 at 18-19.  To get there, Plaintiffs' expert defines "microwell" as limited to microliter volumes.  Ex. 2 ¶ 225.  Because the NanoPen holds volumes less than a microliter, he concludes they are not microwells and are chambers with apertures.  *Id.*  He further opines that the prior art Park reference discloses "a chamber with an aperture (and not an excluded microwell)."  Ex. 2 ¶¶ 225-26.

That definition is irreconcilable with UBC's arguments regarding Park in the IPR on the '408 patent.  UBC argued that Park's microwells—which it repeatedly described as such[4]—were large enough to allow cells to proliferate within them, so a POSA would not be motivated to modify Park to recover cells.  Ex. 5 (IPR2021-01249 Patent Owner Response) at 34 (arguing Park's microwells are "of sufficient size to allow 'attachment and division of captured cells'"), 35 n.10 ("A POSA would not have been motivated to modify the Park device to selectively recover cells for monitoring, when the Park device was specifically designed to culture cells and monitor responses within the microwells

---

[4] A total of 36 times in the Patent Owner's Response.  Ex. 5, *passim*.

of the device, which it reported to do successfully.") (cleaned up). UBC's IPR argument specifically depended on the size of Park's microwells, which have a volume of about 22 picoliters. Ex. 6 (Patent Owner Sur-Reply) at 19 (describing Park's triangular-shaped microwells as "20 μm deep and 50 μm wide"). The Board agreed. Ex. 4 at 58.

Plaintiffs' position here is flatly inconsistent. In the IPR, UBC repeatedly and unequivocally characterized Park's ~22 picoliter wells as "microwells" and relied on their size to prevail. It argued that Park's microwells were made to be large enough to permit cell proliferation within the wells and that meant a POSITA would have no motivation to "selectively recover" cells. That argument persuaded the Board and necessarily disavowed any definition of "microwell" that excluded picoliter-scale volumes like those in Park. Yet UBC now adopts the opposite position: it defines "microwell" as limited to larger *micro*liter volumes, which would exclude Park's smaller picoliter-scale microwells. Microliters are one-million times bigger than picoliters. Simply put, Plaintiffs' infringement position would mean that Park's wells *are not* "microwells" because they are too small—even though UBC's position in its successful IPR was that the same wells *are* "microwells" that are sufficiently large. Further still, UBC now asserts (through Landers) that Park discloses a "chamber with an aperture (and not an excluded microwell)," even though its IPR position was that Park disclosed a chamber *that was* a microwell. These positions cannot reasonably be reconciled.

### 2. The Board accepted UBC's arguments about Park's microwells.

The Board agreed that a POSITA would not have been motivated to modify Park, and so the claims survived BCA's invalidity challenge. Ex. 4 at 57 (citing Ex. 5 at 35 n.10), 58-59; *see Hamilton*, 270 F.3d at 783 (requiring the first tribunal to have "relied on" or "accepted" the previous inconsistent position); *Azod v. Robinson*, No. 22-56186, 2024 WL 163371, at *2 (9th Cir. Jan. 16, 2024) ("[O]ur circuit does not require that the prior court explicitly adjudicate an issue[.]".).

### 3. Plaintiffs' about-face on "microwell" gives it an unfair advantage.

Allowing Plaintiffs to take a contradictory position would give them the unfair advantage of avoiding invalidity in one forum while securing infringement in another. Judicial estoppel exists to prevent this sort of gamesmanship. *See New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (preventing parties from "playing 'fast and loose with the courts'" and from "deliberately changing

1    positions according to the exigencies of the moment"). In the IPR, UBC's description of Park's wells

2    as "microwells" with a sufficiently large size allowed it to prevail. Now, by redefining "microwell"

3    to exclude those *same* wells, it seeks to expand infringement coverage.

4          This strategic reversal is unfair. It deprives BCA of the ability to rely on the public record

5    when assessing its potential liability or building its defense. It undermines the PTAB's reliance on

6    UBC's earlier characterization, which supported sustaining the '408 patent. And it creates a litigation

7    windfall, whereby UBC avoided invalidity in the PTO by arguing about Park's picoliter-sized

8    microwells and now excludes those same wells from its infringement definition. This forces BCA to

9    defend against a theory that the Board record directly contradicts, and "compromise[s] the integrity

10   of judicial proceedings." *See Yanez v. United States*, 989 F.2d 323, 326 (9th Cir. 1993).

11         The Court should apply judicial estoppel and hold Plaintiffs to the IPR position—that

12   picoliter-size wells are "microwells"—and bar Plaintiffs from advancing their current "microwell"

13   definition for infringement purposes. This is Plaintiffs' sole basis for contending that the NanoPen

14   opening is an "aperture" rather than the excluded "surface opening of a microwell." *See* Ex. 2 ¶¶ 223-

15   26. Without it, Plaintiffs cannot meet its burden on this limitation. No reasonable jury could find for

16   Plaintiffs and summary judgment of noninfringement should be granted for all asserted claims of the

17   '933 family.

18   **II.    ABCELLERA DOES NOT PRACTICE THE ASSERTED PATENTS**

19         There is no genuine dispute that AbCellera does not practice any claim of the Asserted Patents.

20   Plaintiffs assert that AbCellera practices the patents to support arguments on which they bear the

21   burden of proof, such as damages, lack of noninfringing alternatives, and nexus for secondary

22   considerations of nonobviousness, among others. But the record shows that AbCellera ███████

23   ████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████. AbCellera's

25   devices have no structures that satisfy the Court's construction of "chamber" for the '408 family, nor

26   do they have any structures that satisfy the Court's construction of "chamber . . . having an aperture"

27   for the '933 family. Plaintiffs have identified no evidence of any ███████████ during the

28   damages period. Because there is no evidence that AbCellera practices the patents, summary

judgment in BCA's favor is warranted.

The undisputed record shows that 

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8    AbCellera's ██████████ chips do not meet the structural requirements of the Asserted

9 Claims.  They do not have "chambers" with at least one "inlet" and at least one "outlet," as required

10 by the Court's construction of these '408 family limitations.  ECF No. 282 at 23-24.  The ██████

11 of AbCellera's chips are not enclosed spaces, as can be seen in the 91k chip drawing above; they are

12 ███████████████████████████████████████████, which is why AbCellera

13 █████████████████████████████████.  Ex. 9 (ABC0003559) at slide 11.  The ████

14 are open, not enclosed, spaces.  They do not have an aperture that permits fluid to enter a "chamber"

15 (an "inlet") and also an aperture that permits fluid to exit a "chamber" (an "outlet").  The ██████

16 ██████████████████ cannot simultaneously be an inlet and an outlet under the Court's

17 construction.  Whatever methods AbCellera may perform using its chips, those methods cannot

18 practice any claim of the '408 patent family, which all require a chamber having an inlet and an outlet.

19    AbCellera's methods cannot practice any claim of the '933 patent family either.  Every '933

20 patent family claim requires retaining a single cell in a "chamber having . . . an aperture."  The Court

21 construed "chamber" in the '933 family as "an enclosed space withing a microfluidic device" (ECF

22 No. 282 at 24), and AbCellera's ██████████ cannot be the claimed "chambers" because they are open,

23 not enclosed, spaces.  The Court construed "aperture" in the '933 family to have its plain and ordinary

24 meaning, "excluding the surface opening of a microwell."  *Id.*  AbCellera's chips ████████

25 ██████████████████████████████████—and thus cannot be the claimed "chamber

26 having . . . an aperture."

27    There is no genuine dispute that ████████████████████████████████████

28 █████████████.  AbCellera calls the chips it uses "████████████████."  Ex. 10

(ABC00780421) at ABC00780421.   AbCellera also refers to ████████████████ Ex. 11

(ABC00011170) at slide 9.  ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████:



Ex. 8, AbCellera's 91k chip.
██████████████████████████.  *Id.* at ABC00005350.



Ex. 13, Rettig & Folch (2005) Fig. 1(e).
Figure 1 describes "seeding of cells in
PDMS microwells," which are 20-40 μm
across and 16-27 μm deep.  *Id.* at 5629.



Ex. 12, U.S. Pub. Pat. App.2011/0281764 to Love
et al. (2010), Fig. 13A.  Love's "microwell array
comprises a block of wells" 50-100 μm wide and
50-100 μm deep.  *Id.* at [0010].



Ex. 14, Park et al. (2010) Fig. 1a.
Park describes "single cell trapping in microwells
with dimensions of 50 μm." *Id.* at 264.

        Plaintiffs' expert Landers does not opine that AbCellera's ████████████████████

███████████████████████████████████████████.  Ex. 2 ¶¶ 342-43, 356.  Indeed, for the '933

family, he does not identify any specific structure in AbCellera's chips that he contends is the claimed

chamber "aperture."  *Id.*  For the '408 patent family, he identifies ██████████████████████ as

being ***both*** the inlet and the outlet (Ex. 2 ¶ 343), which is forbidden by the Court's construction.

Landers's testimony is not sufficient to create a genuine dispute that AbCellera practices the patents.

## III.    PLAINTIFFS CANNOT ESTABLISH INDIRECT OR WILLFUL INFRINGEMENT

        Plaintiffs' damages model rests on infringement by BCA's customers, not by BCA itself.[5]

Plaintiffs' damages case is based solely on indirect infringement.   To sustain their indirect

infringement case, Plaintiffs must prove that BCA had knowledge of its infringement outside of it

---

[5] BCA has separately moved to exclude the opinions of Plaintiffs' damages expert, Dr. Robert Vigil.
Plaintiffs' damages theory is described in detail there.

being served with this lawsuit.  They cannot meet this burden.  Four of the six Asserted Patents issued just before Plaintiffs sued, and there is no competent evidence that BCA had the necessary knowledge of the other two.  Because Plaintiffs have failed to adduce evidence that BCA had the required knowledge of its alleged infringement, they cannot present a genuine dispute as to indirect infringement of any of the Asserted Patents.  The same fatal defect applies to their willful infringement claims, which require the same showing of knowledge.  Plaintiffs' indirect and willful infringement claims therefore fail as a matter of law.

"Indirect and willful infringement both require proof, for each asserted patent, that the defendant knew or should have known (1) of the patent, and (2) that it was infringing the patent." *VLSI Tech. LLC v. Intel Corp.*, 706 F. Supp. 3d 953, 991 (N.D. Cal. 2023); *see also Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015) (indirect infringement "requires knowledge of the patent in suit and knowledge of patent infringement"); *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (same for willful infringement).

Here, no record evidence supports that BCA knew about both the Asserted Patents and its alleged infringement before this litigation.  Plaintiffs' only allegations on this point are that BCA obtained the necessary knowledge of the Asserted Patents through (i) a named co-inventor employed at a BCA predecessor entity; (ii) receipt of a letter from Plaintiffs in October 2019 referencing their broader patent portfolio; and (iii) service of the Complaint corresponding to each of the Asserted Patents.[6]  All three theories are legally defective and otherwise lack evidentiary support.

**First,** Plaintiffs assert that Bruker obtained knowledge of the Asserted Patents through its former employee, Dr. Anupam Singhal, who is a named co-inventor.  This assertion does not withstand scrutiny.  As background, Singhal was a graduate student at UBC until November 2012, where he worked with other co-inventors who eventually formed AbCellera.  Singhal last assigned his invention rights to AbCellera in 2013, and that was the end of his involvement with the Asserted Patents.  He never worked at AbCellera.  He went on to do a post-doctorate at Stanford and eventually became an employee at BCA in June 2016.  Singhal worked at BCA until March 2023.

---

[6] This case stems from three complaints that were ultimately consolidated into the present action. *See* ECF No. 254 (Plaintiffs' Second Amended and Consolidated Complaint).

1      Beyond these facts, there is no evidence in the record that Singhal was ever made aware of

2  the issuance of the Asserted Patents, or the amendments made to the claims during prosecution, let

3  alone provided BCA the required knowledge of its alleged infringement.  For example, Singhal was

4  listed as a co-inventor on the '933, '376, and '378 patents because they were continuations of a *parent*

5  application filed years earlier, but there is no evidence he had any involvement with the '933, '376,

6  and '378 patent applications or the issued patents.  *See, e.g.*, *Midwest Energy Emissions Corp. v.*

7  *Vistra Energy Corp.*, No. CV 19-1334-RGA-CJB, 2020 WL 3316056, at *5 (D. Del. June 18, 2020),

8  *R&R adopted,* No. CV 19-1334-RGA-CJB, 2020 WL 8265330 (D. Del. July 15, 2020) (finding "it is

9  just not plausible (without more) to believe that six years after learning of the [asserted patent's]

10  *parent* in 2013, [defendant's former employee] would have been cognizant of the fact that the

11  [asserted patent] issued in 2019 (a mere eight days before this lawsuit was filed)").  The oldest

12  Asserted Patent (the '408 patent) did not issue until October 2018—many years after Singhal had

13  assigned away his rights to UBC and left UBC.  Four of the Asserted Patents issued days before the

14  complaints were filed, and there is no evidence that Singhal knew about them before those filings.[7]

15  As for the '408 and '936 patents, Plaintiffs similarly lack evidence that Singhal was aware those

16  patents issued or that he conveyed anything to BCA about any potential infringement of them.  At his

17  deposition, Singhal could not recall when he first saw the '408 patent, and Plaintiffs' counsel did not

18  even ask him about the other patents or whether he communicated anything about the '408 patent to

19  BCA.  *See* Singhal Tr., Ex. 15, at 139:24-140:12.[8]  Even if Singhal's knowledge could somehow be

20  imputed to BCA, there would be nothing relevant to impute.

21      Plaintiffs further accuse BCA of employing "assistance from inventor Singhal" to "cop[y]

22  the . . . patent[s] despite knowing that the Accused Instrumentalities are covered by the . . . patent[s]."

23

24  _____

[7] The '408 Patent issued October 2, 2018.  The '936 Patent issued January 17, 2020.  The '270 Patent

25  issued August 11, 2020.  The '933 Patent issued August 25, 2020.  The '376 and '378 Patents issued

26  September 15, 2020.  AbCellera filed three separate complaints—as relevant, the '408 and '936 were

  asserted in the July 9, 2020 complaint; the '270 and '933 were asserted in the August 25, 2020

  complaint; and the '376 and '378 were asserted in the September 16, 2020 complaint.

27  [8] Singhal was not a BCA employee when deposed.  Ex. 15 at 13:18-20 ████████████████████

  ████████████████████████████████████████████████████████████████████████████

28

*See, e.g.*, ECF No. 254 at ¶¶ 291, 338, 383, 430.  These allegations are factually impossible.  Singhal joined BCA in June 2016, and the accused Beacon system launched in December 2016.  The '408 patent issued in October 2018, and the rest were not even filed when the Accused Products launched. BCA's development of the accused Beacon system therefore cannot be a basis to attribute to BCA knowledge of the later-issued patents.  *See, e.g.*, *MasterObjects, Inc. v. Amazon.com, Inc.*, No. C 20-08103 WHA, 2021 WL 4685306, at *3 (N.D. Cal. Oct. 7, 2021) ("Knowledge of a patent cannot be plausibly alleged when the triggering event occurred prior to the issuance of the patent.").  Plaintiffs cannot show that BCA obtained the necessary knowledge through Singhal.

**Second,** Plaintiffs assert that AbCellera's October 2019 letter referencing its patent portfolio provided BCA knowledge of its alleged infringement of the '408 and '936 patents.  That assertion is foreclosed by binding precedent.  In its letter, AbCellera did not identify any particular BCA products and did not allege infringement.  Instead, AbCellera merely informed BCA it had a patent portfolio and invited BCA to "review" a list of 10 patents and applications.  *See* Ex. 16 (AbCellera's Oct. 3, 2019 Letter).  That is insufficient as a matter of law to provide evidence of the required intent element for indirect or willful infringement.  To do that, "[t]he letter must communicate a charge of infringement of specific patents by a specific product or group of products."  *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1373 (Fed. Cir. 2010)); *see Hewlett Packard Enter. Co. v. Inspur Grp. Co.*, No. 24-CV-02220-JST, 2025 WL 754265, at *26 (N.D. Cal. Mar. 10, 2025) (letter that "neither mentioned the asserted patents nor stated that [defendant] was infringing the asserted patents" insufficient to prove pre-suit knowledge for indirect or willful infringement).[9]  AbCellera's letter did not communicate any charge of infringement, did not identify specific patents alleged to be infringed, and did not identify any specific BCA product.  AbCellera's letter therefore cannot present a basis on which to show BCA's knowledge of its alleged infringement of the '408 and '936 patents.

**Third,** Plaintiffs cannot show that BCA obtained knowledge solely because they served BCA

---

[9] AbCellera made the tactical decision to be vague in its letter, presumably so as not to trigger declaratory judgment jurisdiction.  One of the consequences of that choice is that the letter cannot provide a basis for knowledge of indirect or willful infringement.  *See, e.g.*, *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1382 (Fed. Cir. 2007).

1   with the complaints underlying this litigation.  While the Federal Circuit has not addressed the issue,

2   the weight of authority holds that post-suit knowledge arising solely from the complaint itself is

3   insufficient to maintain claims for indirect or willful infringement.  *See, e.g.*, *VLSI*, 701 F. Supp. 3d

4   at 996-997 (collecting cases holding the complaint filing alone cannot provide the required knowledge

5   because "[t]he purpose of a complaint is to obtain relief from an existing claim and not to create a

6   claim," and "a finding that [it] alone satisf[ies] post-suit notice would invite claims of willful

7   infringement and indirect infringement into literally every patent suit") (citations omitted); *Sonos,*

8   *Inc. v. Google LLC*, 591 F. Supp. 3d 638, 645-46 (N.D. Cal. 2022) (emphasizing that a finding to the

9   contrary would undermine "the efficacy of cease-and-desist letters").  This Court has likewise

10  dismissed claims for indirect and willful infringement at the pleading stage for failing to allege "pre-

11  suit knowledge of the patent-in-suit and that the defendant infringed it deliberately or intentionally."

12  *Hewlett Packard*, 2025 WL 754265, at \*25-28; *see id.* at \*26 (dismissing claim for willful

13  infringement where "the complaint [wa]s devoid of plausible allegations that [the defendant] knew of

14  the asserted patents before this litigation began"); *id.* at \*27 (dismissing claim for induced

15  infringement where "the complaint d[id] not contain plausible allegations that [the defendant] knew

16  of the asserted patents prior to this litigation").  Because Plaintiffs have no basis other than the service

17  of their complaints to support post-suit knowledge, the Court should reach the same result here.

18      No other evidence would present a genuine dispute on BCA's knowledge of both the Asserted

19  Patents and its alleged infringement.  Three of the Asserted Patents (the '933, '376, and '378 patents)

20  issued on the same day or the day before Plaintiffs filed their corresponding infringement claim

21  against BCA, and another (the '270 patent) issued just two weeks before Plaintiffs filed their

22  corresponding infringement claim.  Of course, BCA could not have had the necessary knowledge of

23  those patents before they existed.  *See, e.g.*, *Traxcell Techs. LLC v. Google LLC*, No. 22-CV-04807-

24  JSC, 2022 WL 17072015, at \*5 (N.D. Cal. Nov. 17, 2022) ("[T]o have knowledge of a patent, the

25  patent must exist.") (citing *State Indus. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985)).

26  Plaintiffs undisputedly never gave BCA pre-suit notification of those patents or its alleged

27  infringement before they served their corresponding complaints, and it would not have been enough

28  notice even if they had.  *See Sonos*, 591 F. Supp. 3d at 646 (one-day notice would be obviously

insufficient because it is "not enough time to provide an alleged infringer a meaningful opportunity to cease infringing or negotiate a license"). As discussed, Plaintiffs have also pointed to no evidence of knowledge with respect to the '408 and '936 patents. There is therefore no evidence in the record that BCA had the necessary knowledge of the patents and its alleged infringement.

Finally, with respect to only willfulness, Plaintiffs' discovery responses gesture at a new theory that BCA was willfully blind to its infringement. This theory also lacks evidentiary support. Willful blindness requires proving "deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts," and cannot be shown simply by claiming a defendant had a "known risk" that its acts were infringing or through "deliberate indifference." *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769-70 (2011). Plaintiffs' only evidence of willful blindness is the inadmissible opinion of their expert Dr. Landers, which should be excluded for the reasons in BCA's separate *Daubert* motion. Outside of the unsupported say-so of Plaintiffs' paid expert, no evidence supports that BCA was willfully blind to the patents such that its alleged infringement could be considered willful. Plaintiffs therefore cannot present a genuine dispute to the jury on the issue of BCA's willful blindness.

In sum, the foundation of Plaintiffs' ███████ claim for damages is entirely premised on the idea that BCA knowingly and intentionally sold infringing machines to its customers. This simply did not happen, so it is no surprise that Plaintiffs have nothing to present to the jury suggesting that it did. Four of the patents did not exist until just before this lawsuit was filed, and Plaintiffs cannot sustain their infringement and willfulness claims solely on the basis that they served BCA with this lawsuit. Plaintiffs have also failed to support willful blindness. The Court should therefore grant summary judgment against Plaintiffs' indirect infringement and willfulness claims.

## IV.    PLAINTIFFS ALSO CANNOT PROVE CONTRIBUTORY INFRINGEMENT

Even if Plaintiffs could survive summary judgment on the requisite knowledge for indirect infringement, Plaintiffs' contributory infringement theory separately fails because the Beacon system indisputably has substantial noninfringing uses. To prove contributory infringement, Plaintiffs must show that the Beacon system is not "suitable for substantial noninfringing use." 35 U.S.C. § 271(c); *see Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006). "[T]he

inquiry focuses on whether the accused products can be used for purposes other than infringement." *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012). There is no triable issue of fact on this point.

**First**, there are several uses of the Beacon system that Plaintiffs do not even address, much less attempt to prove either infringe or are not substantial, including T-Cell and Genomics applications (Ex. 17, BLI00016429 at BLI00016436), Opto Cell Therapy Development workflows (*id* at BLI00016443), synthetic biology workflows (*id.* at BLI00016444), or custom workflows (Ex. 18, BLI01789593 at BLI01789629). Plaintiffs' expert admitted he never considered these alternatives. Ex. 19 (Landers Tr.) at 64:9-65:1. That alone is dispositive for all Asserted Patents. *See Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009). **Second**, if the Court grants BCA's motion to strike Plaintiffs' theory that the use of the Beacon for Cell Line Development infringes, ECF No. 380-3 at 10, that presents yet another substantial noninfringing use for all Asserted Patents. **Finally**, Plaintiffs have now admitted that there are various workflows that do not infringe three of the Asserted Patents—Plaintiffs admitted that the "phenotypic assay" does not infringe the '933, '376, and '378 patents, ECF No. 390-4 at 3-4; and that the "in-pen diffusion assay" and "ligand blocking assay" do not infringe the '376 and '378 patents, *id.* at 4. These workflows are only accused of infringing some patents and are substantial noninfringing uses for the '933, '376, and '378 patents.

## <u>CONCLUSION</u>

For these reasons, the Court should grant summary judgment of no direct or indirect infringement for all claims, and no willfulness.

1    Dated: August 21, 2025                  Respectfully submitted,

2                                            */s/ Karen I. Boyd*

3                                            Karen I. Boyd (State Bar No. 189808)
                                             boyd@turnerboyd.com
4                                            Jennifer Seraphine (State Bar No. 245463)
                                             seraphine@turnerboyd.com
5                                            Keeley I. Vega (State Bar No. 259928)
                                             vega@turnerboyd.com
6                                            Marc David Peters (State Bar No. 211725)
                                             mdpeters@turnerboyd.com
7                                            Vyson Hsu (State Bar No. 322336)
                                             hsu@turnerboyd.com
8                                            Camilla M. Bykhovsky (State Bar No. 353732)
                                             bykhovsky@turnerboyd.com
9                                            TURNER BOYD SERAPHINE LLP
                                             155 Bovet Road, Suite 600
10                                           San Mateo, California 94402
                                             Telephone: (650) 521-5930
11
                                             Courtland Lewis Reichman (State Bar No. 268873)
12                                           creichman@reichmanjorgensen.com
                                             Jennifer Prieb Estremera (State Bar No. 251076)
13                                           jestremera@reichmanjorgensen.com
                                             REICHMAN JORGENSON LEHMAN & FELDBERG LLP
14                                           100 Marine Parkway, Suite 300
                                             Redwood Shores, CA 94065
15                                           (650) 623-1401

16                                           Christine E. Lehman (admitted *pro hac vice*)
                                             clehman@reichmanjorgensen.com
17                                           Connor Houghton (admitted *pro hac vice*)
                                             choughton@reichmanjorgensen.com
18                                           Savannah Carnes (State Bar No. 335438)
                                             scarnes@reichmanjorgensen.com
19                                           REICHMAN JORGENSON LEHMAN & FELDBERG LLP
                                             1909 K Street, NW, Suite 800
20                                           Washington, DC 20006
                                             (202) 894-7310
21
                                             Patrick Colsher (State Bar No. 336958)
22                                           pcolsher@reichmanjorgensen.com
                                             REICHMAN JORGENSON LEHMAN & FELDBERG LLP
23                                           400 Madison Avenue, Suite 14D
                                             New York, NY 10017
24                                           (212)381-1965

25                                           *Attorneys for Defendant*
                                             *Bruker Cellular Analysis, Inc.*
26

27

28

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that on August 21, 2025, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to all parties who have appeared.


Executed on August 21, 2025.

/s/ *Tina Nguyen*
Tina Nguyen